## THE GLENCAIRN.

### (District Court, D. Oregon. January 14, 1897.)

### No. 4,068.

1. AGREEMENT TO ARBITRATE.

The masters of two vessels which had collided, having differed as to whether a certain part of one vessel was injured thereby, agreed that a certain third person should examine it, "and say if any damage had been done, and to what extent." *Held*, that this was not an agreement to submit to arbitration, especially as there were other matters in dispute to which the agreement did not refer.

2. COLLISION—DAMAGES—LOSS OF CHARTER.

A vessel injured by collision while in harbor awaiting a charter *held* not entitled to damages based on a decline in charter rates while she was undergoing repairs; it appearing that, before the accident, she has declined higher rates, and was held above the market price while rates were falling.

3. SAME—COMMISSIONS ON REPAIRS.

The injured vessel is not entitled to commissions on the money disbursed in making repairs.

4. SAME—SUPERINTENDENCE OF REPAIRS.

A claim for money paid to a third person for superintending the repairs to the injured vessel cannot be allowed, where no reason is shown why the master, who was actually present, could not himself have superintended the repairs.

5. SAME—COSTS—OFFERS OF SETTLEMENT.

Where the claimant of a vessel libeled for collision made reasonable offers of settlement, and, pursuant thereto, paid into court an amount equal to what was afterwards found due by the court, *held*, that he was entitled to his costs.

F. D. Chamberlain and Zera Snow, for libelant.
C. E. S. Wood and J. C. Flanders, for claimant.

BELLINGER, District Judge. The libelant is master of the British ship Bedfordshire, and the libel is for damages caused by a collision between the Bedfordshire and the Glencairn in the harbor at

Astoria. The Bedfordshire was at anchor. The Glencairn had just arrived in charge of a steam tug, and was coming to an anchorage. Through some mistake, or other fault, the Glencairn's anchor was dropped so close to the Bedfordshire that, in coming to, she swung around, and the two ships came in collision, the Glencairn's starboad quarter coming against the Bedfordshire's starboard bow. The libelant claims damages as follows:

| | |
|---|---|
| Necessary repairs to the Bedfordshire, and commissions thereon...... | $3,126 25 |
| Loss of the use of the ship during the time required to make repairs... | 3,650 00 |
| Depreciation of market rates for ships of the class of the Bedfordshire in the meantime............................................... | 1,618 20 |
| Loss of time, and expenses of master and crew, and the wages thereof | 800 00 |
| Injury to the Bedfordshire by reason of the strain suffered, and other and additional losses incident to and resulting from the collision..... | 600 00 |
| Total ................................................. | $9,794 45 |

The claimant admits the liability of the Glencairn, and offers to pay all damages actually suffered by the Bedfordshire as a result of the collision, but denies that such damages are more than $2,299.50, which sum the claimant has deposited in the registry of the court for the libelant's use.

The principal controversy in the case grows out of an injury to the main lower cap of the Bedfordshire. This main cap is a large double band of iron, weighing about 400 pounds, and shaped like a figure "8." It is almost nine inches in depth and one inch thick. It is the means by which the main topmast is secured to the mainmast. While the Bedfordshire was off Cape Horn, on her voyage to this port, her topsail lanyards were carried away during a storm, and the yard, weighing probably three tons, came down. The force of the blow was such that the main cap was cracked on the starboard side, the crack extending to the eye bolt hole, about the center of that part of the main cap through which the mainmast extends. As to this there is no question. It is claimed on behalf of the Bedfordshire that, among other injuries sustained by her by the collision in Astoria harbor, there is a second crack of the main cap, not so deep and serious as the former injury, but serious enough to make it necessary to replace the old cap with a new one, at an expense greatly above what would be required if the vessel could have had the repair made in her home port, as she might have done if it had not been for the second injury; the claim being that it was practicable, had there been but one crack, to have reinforced or temporarily repaired the main cap, with a lashing called a "Spanish Cap," so that the vessel could have completed her voyage. On the other hand, it is contended, for the Glencairn, that the second or smaller crack did not result from the collision, but was caused by the same blow that caused the injury on the starboard side (the lesser injury was on the port side and directly opposite the crack on the starboard side); and it is further contended that, without the smaller crack, the vessel could not safely have gone to sea without a new main cap, and that what is called the "second injury" did not, therefore, add to the cost of repair, or delay the vessel in this port.

The evidence bearing upon the question as to whether the injury

to the main cap on the port side was caused by the collision, or by the falling spar off Cape Horn, is conflicting. The captain of the Bedfordshire, the mate, and third mate all testify that they made careful examinations of the main cap after the accident off Cape Horn, and that the crack on the port side was not there until after the collision. The mate lashed the main cap with wire lashings. Hannaford, a seaman on the Bedfordshire, painted the main cap about a week before the vessel arrived at Astoria, first chipping off the blisters on it. He painted between the lashing, and would, so he testifies, have seen a crack on the port side, had there been one. Upon examination, made by the captain and the two officers named, and by Freeman, an Astoria blacksmith, after the collision, the crack on the port side appeared to be a fresh crack, and there was no paint to be seen on its edges. On the other hand, Capt. Wright, of the Glencairn, testifies that he examined the main cap shortly after the collision, that both cracks appeared to be old ones, and that he could see traces of paint on the edges of the crack on the port side. Hamilton, the Glencairn's first officer, testifies that this injury was an old one, and that he found a part of the port-side crack covered with paint; the crack extending beneath the paint, thus showing that this injury existed at the time the main cap was painted.

There is difference of opinion as to whether the strain upon the masts of the Bedfordshire, caused by the pulling off of the Glencairn, could have resulted in the port-side injury to the main cap. On the one hand, it is claimed that the backstays of the Bedfordshire would not permit her topmast to come forward, as it must have done to cause the injury. It is not claimed that there was anything unusual as to the condition of these backstays after the collision. On the other hand, Capt. Hugo, of the Bedfordshire, testifies that the backstays on his ship are of wire, with rope lanyards, and that these stays are always slack to a degree. Smith, the third mate of the Bedfordshire, testifies that, when the Glencairn was being hauled off by the tug, he saw the mainmast, the main topgallant mast, and the royal all bent forward. This proves too much. If the mainmast bent forward with the topgallant, it is not probable that the main cap connecting the two would have been subjected to an unusual strain.

I think the probabilities are that both cracks in the main cap resulted from the same cause. The effect of the blow from the falling of a spar weighing three tons, from such a height, upon the main cap, is demonstrated by the injury which it is admitted to have caused. Both sides of the main cap were subjected to practically the same strain by this blow, and, while a crack upon one side from this cause might not necessarily be accompanied by a like injury on the other, such would be its tendency. Furthermore, it is not probable that the backstays of the Bedfordshire could have been slack enough to permit the topgallant and royal masts to come forward so as to have produced this injury. The office of these stays is to prevent these masts from coming forward at all. If, however, the stays on the ship are slack to this degree, then what is claimed

to have happened when the Glencairn was pulled off after the collision would be likely to happen at sea in bad weather. The pitch of the ship in a rough sea would inevitably cause the topgallant and royal masts to come forward as far as the slack of the backstays would permit, and the strain upon these masts by the pulling apart of the two ships could do no more; so that one of two conclusions is unavoidable: Either the backstays prevented these masts from coming forward, and the injury on the port side of the main cap was not caused, as claimed for the Bedfordshire, or else the liability of the ship to this injury made it unsafe for her to proceed to sea without a new main cap.

I do not overlook what is claimed as to a temporary repair by the expedient of what is called a "Spanish Cap,"—a wire lashing around the main cap,—to enable the vessel to reach her home port. There was already a wire lashing around this cap at the time of the collision. How much more extensive the proposed Spanish cap was to be does not appear. The one already there did not suffice to prevent further injury, assuming that the port-side crack was caused by the collision. And, as to this, it is not shown that, but for the port-side injury, the Bedfordshire would have completed her voyage without the expense of a new main cap. It is true that Capt. Pope, acting as an arbitrator in the matter, stated, in his award, that it appeared to him that the damage to the cap on the starboard side, while to some extent a serious one, could have been temporarily repaired, and that the repair, supplemented by a Spanish cap, would have enabled the vessel to prosecute her voyage to a port where repairs could have been effected more reasonably than here. But, as a witness, Capt. Pope said: "With the single crack, I would possibly have allowed the vessel to go with the Spanish cap. With two cracks, I should certainly have not done so." In view of this statement, I cannot assume that the Bedfordshire could have completed her voyage without a new main cap. To say the least, the matter is left in such uncertainty as to preclude damages; and, furthermore, I am not inclined to encourage such makeshifts as this, whereby, regardless of the property interests involved, the lives of seamen are jeopardized merely that there may be saved to the owners of vessels the paltry difference between the cost of repairs as between this and some other port.

Libelant claims, also, that by agreement of parties the matter of this injury was submitted to the arbitration of Capt. Pope, who made a report favorable to the Bedfordshire. But, while the arbitrator proceeded in the utmost good faith, there is serious dispute as to whether any agreement to arbitrate existed. Capt. Pope was absent from the city when the understanding, whatever it was, in pursuance of which he acted, was had, and his information in the premises was derived from the libelant. Capt. Wright, of the Glencairn, says that there was no agreement to arbitrate, but merely an agreement on his part that Capt. Pope should examine the Bedfordshire's main cap, and report whether the second injury was a new or an old one. Capt. Hugo, of the Bedfordshire, testifies that there was an agreement to arbitrate,—that it was agreed verbally that

Capt. Pope was to go down, examine the cap, say if the Glencairn had done any damage to it in the collision, and, if so, to what extent.

There is no disagreement between the two masters as to the understanding in pursuance of which Capt. Pope acted. They disagree as to the effect of that understanding, one claiming and the other denying that it was an arbitration. To bind the parties, an agreement to arbitrate ought to be certain. The authority of the arbitrator to make a decision should not be left to implication. The law implies an agreement to abide the result of an arbitration, but it cannot imply the agreement to arbitrate from the questionable authority to examine "and say if any damage had been done, and to what extent." There is here no agreement to submit any question to the decision of Capt. Pope. The damage to the main cap, while the principal cause of dispute between the parties, is not the only one. There are other matters of dispute between them which would naturally and probably have been included in any arbitration of difference between them.

I cannot allow damages based upon the claim that the Bedfordshire was kept out of the market by reason of her injuries. The Bedfordshire was held for higher charters than were offered, and the market was a falling one. She was in the harbor nearly a month before the collision, and had declined offers for her charter as high as 35 shillings. She was, according to the testimony of Mr. Sibson, being held above the market. It is claimed that, at the date of the collision, and following, she was worth 32s. 6d.; but the testimony tends to show that she was held above that figure, and that the market continued to decline. She is not entitled to recover from the Glencairn the value of the market which she refused. She was not an exception in this regard. Other vessels equally valuable declined charters in the state of the market, and remained in port after the Bedfordshire had completed her repairs.

The claim for commissions on money disbursed in repairs is made on the authority of the case of The Clan Mackenzie,[1] but the claim was not contested in that case. I do not think that the fact of such an allowance is sufficient to establish the validity of claims of this character. It is argued that the fact that the claim was not contested in the case of The Clan Mackenzie goes to show that it is above controversy. There is force in this suggestion, and yet the fact, if it is a fact, as I assume from the failure to cite any other like case, that there is no other case where such an item has been included in an award of damages, compels me to disallow it in this case. It was probably submitted to in The Clan Mackenzie Case because of the fact, testified to in this case by Mr. Laidlaw, who made the claim in that case, that such charges are customary. I am not prepared to recognize a custom among shippers, in allowing between themselves commissions upon moneys disbursed, as establishing a rule of damages in cases of maritime collision.

Neither the claim for costs in the Spreckels libel suit against the

---

[1] Reported sub nom. The Oregon, 45 Fed. 62.

Bedfordshire, nor that for Mr. Cherry's services for superintending repairs, can be allowed. The Spreckels libel was against both vessels, and was for a salvage service. There was no foundation for such a claim against the Bedfordshire, and it is not the fault of the Glencairn that the Bedfordshire was included in the libel for its enforcement. The Glencairn, in its answer in that case, admitted that the towage service was made at its request, and it offered to pay what it contended was a reasonable compensation therefor, and finally compromised and paid the demand. It did not attempt to shift any part of the responsibility for what had been done upon the Bedfordshire. Nothing more was required of the Glencairn. One of the items claimed, on behalf of the libelant, as an expenditure of Mr. Cherry, is for $125, services in superintending the repairs made upon the Bedfordshire at Astoria. There is no reason shown why the master could not have superintended these repairs himself, and, in fact, he was actually present during the whole period, and there is no more fit or proper person for superintending repairs of a vessel than her master, and this item cannot be allowed.

There are several other minor claims made on behalf of the libelant, but, on an examination of them, I cannot find that they fell either within the rule of "restitutio in integrum," or within the rule that only the damages resulting directly from the injury as a proximate cause ought to be made good.

Since the announcement of the foregoing opinion, the proctors for the libelant and claimant, respectively, have agreed upon certain items as falling within the tender, made in general language by the answer, that claimant would pay all damages resulting from the collision as a proximate cause. The gross amount of these additional items is $340.15, which will be included in the decree. And I have also heard the proctors for libelant and claimant, respectively, upon the question of costs, but am of the opinion that the libelant should bear the costs, because, while the letter in evidence, dated January 13th, is not, in a strict legal sense, an acknowledgment of liability, it clearly admits the liability for the purposes of an amicable settlement, and asks only that further information be given in regard to itemizing certain lump charges. This was, I think, a reasonable request, and should have been answered; and, under the rule that the courts ought to do all that they can to favor amicable settlements, and to discourage litigation, I must adhere to my resolution to adjudge costs to the libelant. I am of the opinion that the amount tendered by the claimant and paid into court is all that libelant is entitled to recover, and that the claimant is entitled to his costs, and to this effect will be the decree. A decree will be prepared and entered in accordance with this opinion.