GALVESTON TOWING CO. et al. v. CUBAN S. S. CO., Limited.

(Circuit Court of Appeals. Fifth Circuit. April 13, 1912.)

No. 2,187.

1. COLLISION (§ 71*)—MOVING AND MOORED VESSELS—FAULT OF MOVING VESSEL.

A tug, which brought her tow into collision with a steamer lying at a pier in a slip at night, *held* not to have sustained the burden which rested on her to exonerate herself from fault by showing that the eyebolt in the drum of the steering wheel, holding the end of the tiller rope, broke: it appearing that it broke when the collision was imminent and in an effort of the steersman to suddenly change the course.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 101; Dec. Dig. § 71.*

Collision with or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

2. COLLISION (§ 75*)—MOVING AND MOORED VESSELS—CONTRIBUTORY FAULT.

In the absence of any harbor regulation requiring it, a vessel lying at a pier wholly within a slip is not chargeable with fault contributing to a collision with a moving vessel because she did not display a light at her stern, which was toward the entrance to the slip.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 105-121, 207; Dec. Dig. § 75.*]

3. COLLISION (§ 130*)—SUIT FOR DAMAGES—INTEREST.

In a suit for collision, where damages are awarded, interest is allowable thereon from date of collision, but commissions and insurance paid to other parties for advances procured to enable the injured vessel to make repairs are not allowable.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 284; Dec. Dig. § 130.*]

4. COLLISION (§§ 134, 132*)—SUIT FOR DAMAGES—DAMAGES RECOVERABLE.

Items of damages included in a decree for collision considered.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 288, 286; Dec. Dig. §§ 134, 132.*]

Appeal from the District Court of the United States for the Southern District of Texas.

Suit in admiralty by the Cuban Steamship Company, Limited, owner of the steamship Cayo Domingo, against the Galveston Towing Company and others. Decree for libelant, and respondents appeal. Amended and affirmed.

This is an appeal from a decree of the District Court of the United States for the Southern District of Texas, Galveston Division, for $5,404.62, and interest, awarded to appellee, as owner of the steamship Cayo Domingo, against appellants, as claimants of the steam tug C. H. Moore, and barge Guyton No. 1, as damages sustained by appellee by reason of its said steamship being collided with by the said barge, which at the time was being towed by the said tug.

The collision occurred at about 5 o'clock on the morning of January 20, 1909, in the port of Galveston, Tex. The steamer was lying at the time in a loading berth. She had been placed there by the pilot who brought her in from the sea, according to orders she had received, on January 12th, and was partly loaded. She was moored to, and on the west side of, pier 38, in the slip between piers 38 and 39, her head pointing inshore, and her stern not less than 100 feet from the entrance to the slip, which extended in a

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

northerly and southerly direction 1,200 feet in length and was 200 feet in breadth at its entrance from the channel at the north end, and sloped to 175 feet in width at its southerly or inshore end. The tug and barge had left the slip on the morning of January 18th, to go to Long Reach, on Buffalo Bayou, for a barge load of fuel oil, and were returning from this trip when the collision occurred.

In his libel the owner of the Cayo Domingo claimed that the tug and tow were unskillfully navigated in entering the slip; that due allowance was not made for the flow of the tide; that the tug was not of sufficient power to handle the barge, which it claims was deeply laden, and failed to put out lines or use other means to avoid the collision; further, that it was negligent for the tug to have attempted to enter the slip at night; that it should have known that a steamer was lying at its berth; that the pilot was not competent, or the crew or the lookout sufficient; and that the master was asleep.

The claimants' defenses were: The collision was the immediate result of an inevitable accident, viz., the breaking of an eyebolt in the steering wheel. The tug and tow were properly managed. The pilot was competent. The crew and lookout were sufficient and proper and reasonable care was used in entering the slip, and that the steamer was negligent in the following respects: (1) She did not display a light. (2) She was moored with her bow toward the shore, thus exposing the propeller to contact. (3) The propeller was not disconnected; if it had been, the damage would probably have been lessened, and she would not have been injured internally. (4) The steamer kept no proper lookout.

The respondents appealed to this court.

Jas. B. Stubbs, for appellants.

William B. Lockhart, for appellee.

Before PARDEE and SHELBY, Circuit Judges, and MAXEY, District Judge.

PARDEE, Circuit Judge (after stating the facts as above). In the case of The Degama, 150 Fed. 323, 80 C. C. A. 93, this court held:

"When a vessel in motion runs into a vessel moored, the rule is that the moving vessel must exonerate herself from blame. The Virginia Ehrman and The Agnese, 97 U. S. 309–315, 24 L. Ed. 890, and cases there cited. In such a case there is a presumption of fault on the part of the moving ship, and the burden of proof is on her to exonerate herself from liability. The Oregon, 158 U. S. 186, 15 Sup. Ct. 804, 39 L. Ed. 943; The Granite State, 3 Wall. 310, 314, 18 L. Ed. 179; Inland & Seaboard Coasting Co. v. Tolson, 139 U. S. 551, 554, 11 Sup. Ct. 653, 35 L. Ed. 270; Pennsylvania R. Co. v. Ropner (C. C.) 105 Fed. 397; The Bridgeport, 14 Wall. 116, 20 L. Ed. 787."

[1] The claimants in this case show no proof exonerating the moving tug and barge from liability. The only evidence that looks in that direction is that showing that the eyebolt in the drum of the steering wheel of the tug, fastening or holding the end of the tiller rope, and which eyebolt was free from flaw or fault, broke, when, to avoid the collision, the wheel was sharply turned in an effort to put the helm hard astarboard, and thus the steering gear of the tug was disabled—all of which is claimed to be an inevitable accident.

The mate of the tug, who was at the wheel at the time, testified as follows:

"Q. Did you do anything in order to keep away from the steamer? A. I altered my course a little towards the west in order to swing the barge away from the ship, and in trying to alter the bow of the barge my helm gave way.

"Q. How many points did you turn on your compass? A. I should judge about eight points.

"Q. You turned about eight points around towards the steamer? A. Yes, sir.

"Q. Did you see your steering gear prior to the accident? A. My steering gear was all right when I went on watch at 12 o'clock that night.

"Q. Was it ordinarily strong? A. Yes, sir; it was ordinarily strong.

"Q. Would it break with a light pull of the helm? A. No, sir; I had to pull the helm over pretty strong in order to make the turn.

"Q. Which turn? A. In order to put my helm hard astarboard, I had to pull hard on the helm in order to do it.

"Q. When did you put the wheel hard astern? A. Well, if I had gone 75 feet further without breakage of my wheel rope in steering clear of the barge, I would have cleared the ship.

"Q. What barge? A. One right across from the ship."

From this it seems that the eyebolt broke when the collision was imminent, and that in an effort to escape contact an attempt was made to turn the course eight points of the compass, whereby the tiller rope was so unwound from the drum of the wheel that the end at the eyebolt was reached and the said bolt broke.

In the record there is some evidence tending to show that the bolt was a brass one taken from a yacht and had been in use four or five years. See The Edmund Moran, 180 Fed. 700, 104 C. C. A. 552.

On the evidence in the transcript, we fully concur with the District Judge in holding the tug and barge to be in fault for the collision with the Cayo Domingo.

[2] The only claimed negligence on the part of the Cayo Domingo entitled to serious consideration is that she did not display a light at her stern. It may be that a vessel tied up to the shore or to a wharf or pier, where her stern projects out into the channel so as to in any wise obstruct or impede navigation, should display a light at night. This however, is not such a case, and as there was no harbor regulation requiring the same, it seems clear that the Cayo Domingo was not in fault for not displaying a light when she was tied up in a slip out of the way of ships passing in the night. See The Granite State, 3 Wall. 310, 18 L. Ed. 179; The Bridgeport, 14 Wall. 116, 20 L. Ed. 787.

[3] The District Court allowed damages for detention, repairs, and other incidental items amounting to $5,404.62, with interest thereon at 6 per cent. per annum from the 6th day of March, 1909, the day on which repairs were finally completed at Newcastle. Error is claimed in allowing interest beyond the date of the decree, but we think the only error in the matter was that interest was not allowed from January 20, 1909, the time of the collision. See The Manitoba, 122 U. S. 97, where the proper rule is given at the bottom of page 101, and see top of page 110, 7 Sup. Ct. 1158, 30 L. Ed. 1095. In that case as against a surety on bond to abide a decree interest was only allowed from date of decree.

[4] The fifth assignment of error attacks many of the items allowed as excessive and some as not proper to be allowed at all. We have looked through the transcript and find that the items complained of are well sustained by the evidence as correct in amount, except

one for discharging and reloading cotton, $822.60. In relation to this charge, Stevedore Suderman, who did the work, testifies:

"Q. This charge here of 60 cents per bale, that would be 30 cents for unloading and 30 cents for loading again? A. Yes, sir.

"Q. In other cases of loading your ordinary charge is, how much? A. 18 cents.

"Q. Per bale? A. Yes, sir.

"Q. Of that amount 12½ cents is paid for labor? A. Yes, sir. * * *

"A. I do not remember. I think they were working on the propeller on Sunday. I do not think I worked on Sunday. I think we worked one night in discharging it.

"Q. And no other overtime? A. No. sir; and that night is included in that 60 cents.

"Q. Are you positive that you worked overtime? A. Yes, sir; I know we worked one evening overtime.

"Q. How long? A. I do not think but three-quarters of an hour, that would be until a quarter to 7."

Morrison, another stevedore, testifies as follows:

"Q. Have you seen Mr. Suderman's bill filed in this case for work done as stevedore? A. No, sir.

"Q. I want to ask you if, under your testimony as brought out by counsel, you want to criticise this bill and say that it is unreasonable? A. What is this 30 cents?

"Q. Yes, sir; discharging and trucking into shed and trucking from shed and loading on the ship? A. For loading cotton—round cotton?

"Q. Yes, sir. A. Yes, sir; it is excessive.

"Q. What do you say about these other bills 1,356 square bales at 60 cents, trucking into shed and trucking out of the shed and trucking from shed and loading onto the ship? A. Well, it is more than anybody else charges.

"Q. You think so? A. Yes, sir.

"Q. Do you know whether that would have been excessive if the work had been done on Sunday? Do you think that would have been excessive if there was overtime work and Sunday? A. No, sir; not for overtime, but for ordinary work it would be excessive."

In our opinion, the possible working 45 minutes overtime in one evening did not justify the full charge made in this case, and the item should be reduced to $497.15, being excessive to the sum of $325.45. And we find some items that should not have been allowed, as the following: For ship's watchman, $20; the charge for detention eight days at Galveston and allowed in the decree is based on the charter contract for demurrage and supposed to cover all expenses for laying up the ship, and the full amount was allowed. The other watchman allowed for was a watchman of unloaded cargo which seems proper. The fee for the Board of Marine Underwriters' correspondent, $100, should not be included in the damages, as such correspondent was acting for the insurance companies. His intervention in the case may have facilitated the adjustment of insurance, but we do not think it was an element of damage for which the respondents are chargeable. The item for commission on advances to pay for repairs, $86.90, and the item for insurance on draft for the same, $44.53, should have been disallowed. The respondents were liable for the damages resulting from the collision on the day thereof, and, if not then paid, to interest thereon at the legal rate until paid. But commissions and insurance to other parties for advancing the money to pay the damages are not allowable. In general, the damages for

nonpayment of money when due are compensated in admiralty as at law by allowance of interest. For a discussion of the matter, see The Glencairn (D. C.) 78 Fed. 379.

As we disallow the commission charged, to do full justice in this case, interest on the damages decreed should be allowed from the date of the collision.

The other assignments of error are not well taken.

It follows that the decree of the District Court should be reduced by the sum of $576.88, and amended so as to bear interest from January 20, 1909, and as thus amended affirmed; and it is so ordered.