## THE EL MONTE.

## THE CLEMATIS.

### (Circuit Court of Appeals, Fifth Circuit. June 18, 1918.)

### No. 3097.

1. COLLISION ⬩100(2)—NARROW CHANNELS AND HARBORS—FOG SPEED AND SIGNALS—EVIDENCE.

A vessel moving past and near the docks of a harbor, and striking a vessel approaching a pier to berth and whose fog signals had been heard, *held* in fault, proximately causing the collision, by failure to observe the requirements of article 16 of Regulations for Preventing Collisions in Harbors and Inland Waters (Comp. St. 1916, § 7889), in not maintaining a moderate speed, and in not stopping her engines sooner and navigating with caution until the danger of collision was over.

2. COLLISION ⬩100(2)—FOG—STOPPING IN CHANNEL.

Collision *held* not primarily due to the fault of the vessel struck in stopping and lying in a fog substantially motionless across the channel, directly in the path of the colliding vessel, with notice of its approach.

3. COLLISION ⬩100(2)—FOG—SIGNALS.

Vessel, struck by another while approaching a pier to take a berth, *held* not at fault in failing to give fog signals as required by article 15 of the Inland Rules (Comp. St. 1916, § 7888).

4. COLLISION ⬩100(2)—FOG—LOOKOUT.

A vessel, approaching in a fog a pier to berth, when struck by a vessel passing the docks on the water front, *held* not in fault proximately contributing to the collision by failure to maintain a proper lookout.

5. COLLISION ⬩96—PROXIMATE CAUSE—LAST CLEAR CHANCE.

If signals from the Clematis gave notice to the El Monte of the presence of a vessel ahead when the El Monte was hidden from view by a fog, and the El Monte thereafter negligently failed to take suitable precautions to avoid a collision, and the Clematis was not negligent after the imminence of a collision was disclosed to it, the El Monte was solely responsible, because having the last clear chance to avoid the collision.

6. COLLISION ⬩136—DAMAGES—DETENTION.

Where the vessel damaged by collision was detained in her clearance port undergoing repairs from the date of the collision February 10, 1916, to March 22, 1916, an allowance of 40 days' detention, excluding the sailing date, at the charter rate for demurrage, was proper, where it appeared that the owner could have realized more for the vessel during that time.

7. COLLISION ⬩128—DAMAGES—LOSS OF PROFITS.

The loss of profits or of the use of a vessel pending repairs or other detention arising from a collision is a proper element of damage.

8. COLLISION ⬩130—DAMAGES—INTEREST.

As the party responsible for damages resulting from a collision became liable when it occurred, interest on the amount of such damages, if not then paid, was allowable from that date.

9. COLLISION ⬩137—DAMAGES TO CARGO—AMOUNT.

Where a cargo of wheat was partly damaged by a collision in Galveston, the loading port, necessitating its unloading, drying, reconditioning, and reloading, an award of damages to its owner in the difference between its market value at Rotterdam, its destination, in sound condition, and its value there in its damaged condition, was not improper, where its sale in Galveston would have been made at a sacrifice and its delivery at destination minimized the loss, and such difference was less than the difference between its value at Galveston before the collision and its value there after it was reconditioned.

⬩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Southern District of Texas; Waller T. Burns, Judge.

Libel by the Stag Line, Limited, claimant of the steamship Clematis, and the Commission for Relief in Belgium, against the Southern Pacific Company, claimant of the steamship El Monte and cargo, and the National Surety Company. Decree for libelants, and respondents appeal. Affirmed.

J. Parker Kirlin, Charles R. Hickox, Robert S. Erskine, and Wm. H. McGrann, all of New York City, and W. T. Armstrong, of Galveston, Tex., for appellants.

Mart H. Royston and Wm. B. Lockhart, both of Galveston, Tex., for appellees.

Before WALKER and BATTS, Circuit Judges, and GRUBB, District Judge.

WALKER, Circuit Judge. This is an appeal from a decree which adjudged the steamship El Monte liable for damages resulting to the steamship Clematis and its cargo from a collision between the two vessels which occurred near one of the docks in the port of Galveston. Each of the vessels, which had been on opposite sides of the same pier, the Clematis on the east side and the El Monte on the west side of it, started on a voyage during the afternoon of February 10, 1916; the Clematis getting under way in the channel about half an hour before the El Monte, both going east. The weather was fairly clear when the Clematis started, but a heavy fog came up ahead while it was still in the harbor of Galveston and was passing the docks on the city's water front, and the pilot and the captain of the vessel concluded to berth it until the fog lifted. The pilot on the Clematis, who had passed along the water front a short while before, knew that there was a vacant berth at Pier 21, and it was determined to put the vessel in there. When it was approaching that pier, to be berthed there, and was near enough to it for attempts to be made to get a line to shore, which was on the vessel's starboard side, the El Monte collided with it on its starboard quarter.

In behalf of the El Monte it is claimed, first, that that vessel is not liable for any of the damage sustained by the Clematis and its cargo; and, second, that, if the El Monte was so at fault as to make it liable, faults chargeable against the Clematis were such as called for a division of the loss occasioned by the collision.

A large volume of evidence was adduced, some of it being depositions of witnesses examined out of court, but a considerable part of it on both sides being the testimony of witnesses examined in the presence of the trial judge. The court did not set out its findings of facts. The evidence adduced by the opposing parties was very conflicting. It would be exceedingly difficult, if not impossible, for an appellate court to reach satisfactory conclusions from an examination of the record as to many material matters, if there existed no basis for presuming in favor of the correctness of findings which the decree rendered, in the light of the evidence, indicates were made by the trial court. But we are not to be unmindful of the fact that, so far as conflicting versions

of occurrences were given by witnesses examined in the presence of the trial judge, there may have been evidences disclosed to him, but not found in the written report of the testimony made a part of the record on appeal, of the verity of one version and of infirmities in the opposing one, justifying the conclusion that a preponderance of the evidence sustained such findings as would support the decree appealed from.

[1] The record is not such as to justify us in concluding that the El Monte is not liable for any of the damage caused by the collision. The distance by way of the channel traversed from the starting place of the two vessels to where the collision occurred is about a mile and a half. Long before the El Monte was in dangerous proximity to the Clematis, it was obvious to those in charge of the former that there was a dense fog ahead, preventing objects within it being seen until they were too near to be avoided by a vessel moving at such speed that it could not be maneuvered with great promptness. The space covered by the fog was one within which other vessels were likely to be. There was much testimony tending to prove that while the El Monte was gaining on the Clematis repeated fog signals, and also danger signals occasioned by the presence of small vessels near the Clematis, were given by the latter, which must have apprised those in charge of the former, if they were duly watchful, of the presence of a vessel in the fog ahead. Though the testimony in behalf of the El Monte was to the effect that such signals were not heard by any one on that vessel, the record does not enable us to say that the trial court was not justified in finding that the signals were given by the Clematis, as testified to, and must have been heard by those in charge of the navigation of the El Monte. While the witnesses for the El Monte denied that the fog signals testified to were heard, its pilot, who was a witness in its behalf, admitted that, as that vessel backed out of the berth from which it started, he "heard a whistle down the channel, blew maybe two or three whistles," and that afterward he heard "a ship blow two long and one short," the signal for a tug, but that "he did not know where the vessel was that blew the whistle—whether it was at the wharf or at sea."

Other testimony made it plain that the signal for a tug which the El Monte's pilot admitted he heard was given by the Clematis, and that it was heard and the direction of it, apparently without difficulty, located by the captain of the tug Kelly, which at once proceeded towards the Clematis, according to the testimony of the Kelly's captain, who was a witness for the El Monte, having the El Monte right behind it as it went down the channel, and getting within seeing and speaking distance of the Clematis just before the collision occurred. The Kelly had assisted the Clematis to get away from the dock from which it started, and, according to the testimony of its captain, then went east, stopping at Pier 39 for fuel oil, and, just as it was leaving that place, it heard, and immediately started in response to, the signal of the Clematis for a tug. The evidence was such as to support a finding that a proximate cause of the collision was the nonobservance by the El Monte of the requirements of the following explicit statutory regulation, prescribed to prevent collisions:

"Every vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at a moderate speed, having careful regard to the existing circumstances and conditions. A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained, shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until the danger of collision is over." Article 16 of Regulations for Preventing Collisions in Harbors and in Inland Waters. 3 U. S. Comp. Stat. 1913, § 7889 (Comp. St. 1916, § 7889).

When the Clematis first could be seen through the fog by those directing the navigation of the El Monte, the latter was moving with such speed that it could not be kept from running into a vessel directly ahead, which was stationary or slowly moving in the same general direction in which the El Monte was going. Just prior to and at the time of the collision, the El Monte was moving past and not far from the docks along the water front of a busy port, where other vessels were likely to be met or overtaken; a dense fog rendering objects ahead not visible until they were so near that a vessel moving as the El Monte was could not avoid colliding with another vessel in its path, which was not moving towards it or across its course, and not long before having been apprised that another vessel was near enough for a signal from it to be heard, whether the location of such other vessel was or was not disclosed. Considering where the El Monte was and the attending circumstances and conditions, we think the conclusion was warranted that it was not maintaining the moderate speed required by the first paragraph of the above-quoted regulation. The Nacoochee, 137 U. S. 330, 11 Sup. Ct. 122, 34 L. Ed. 687; The Umbria, 166 U. S. 417, 17 Sup. Ct. 610, 41 L. Ed. 1053; The Sagamore, 247 Fed. 743, —— C. C. A. ——; Quinette v. Bisso, 136 Fed. 825, 69 C. C. A. 503, 5 L. R. A. (N. S.) 303. A phase of the evidence was such as to support a finding that the El Monte heard, apparently forward of her beam, the fog signal of a vessel the position of which was not ascertained, with the result of imposing upon it the duty of complying with the requirement of the second paragraph of the quoted regulation. The trial court may have been fully justified in regarding that phase of the evidence as the one worthiest of belief, and in concluding that the El Monte, before the Clematis was visible through the fog, should have stopped her engines sooner than she did, and then navigated with caution until the danger of collision was over, and that its failure to do so was a proximate cause of the collision. Lie v. San Francisco & Portland S. S. Co., 243 U. S. 291, 37 Sup. Ct. 270, 61 L. Ed. 726.

[2-5] Mention will be made of the faults attributed to the Clematis: (1) In behalf of the El Monte it is urged that the collision was primarily due to the fault of the Clematis in stopping and lying in a fog substantially motionless across the channel, directly in the path of the El Monte, and about at right angles to the course of the latter, with notice that it was approaching from the west. The evidence well supported a finding against this contention. There was testimony to the effect that several minutes before the collision occurred the course of the Clematis in the channel was changed by sheering or canting it, so as to head it in the direction of the wharf at which it had been determined that it would seek a berth; that, though the Clematis signaled for a

tug and desired the assistance of one in getting docked, it did not stop and wait for such assistance, but, just before the collision, was moving very slowly towards Pier 21, and at the time of the collision was in such a position with reference to it that it was at an angle of about 45 degrees to the course of the El Monte, and was near enough to that pier for attempts to be made, with some chance of success, to get a line ashore. This testimony as to the position of the Clematis, just before and at the time of the collision, with reference to the wharf and the course of the El Monte, was convincingly corroborated, and the opposing testimony discredited, by the evidence afforded by the appearance after the collision of the part of the Clematis which was struck by the El Monte. By measurements and pictures the nature of the wound in the Clematis was graphically disclosed to the court. The angle of collision as thus disclosed persuasively indicated that the Clematis was not directly athwart the channel and obstructing the navigation of an overtaking vessel which was going at such speed as to be able to keep out of the way of a vessel ahead when it could be seen, there being ample unobstructed room in the fairway for any movements required to accomplish this result.

(2) Another contention is that there was a failure on the part of those in charge of the Clematis to give fog signals as required by article 15 of the Inland Rules. 3 U. S. Comp. St. 1913, § 7888 (Comp. St. 1916, § 7888). This contention is based on testimony which, as above stated, is in sharp conflict with other testimony to the effect that fog signals were given by the Clematis as required by the rule, and that other signals also were given when the El Monte was near enough to be apprised thereby of the presence of the Clematis ahead, and yet was far enough away to avoid a collision if the signals had been heeded and properly acted on. It is not made to appear by the record that a finding based on the last-mentioned phase of the evidence was clearly wrong.

(3) It is contended that the failure of the Clematis to maintain a proper lookout was a fault proximately contributing to the collision. Circumstances of the collision which are uncontroverted make it plain that the occurrence was not attributable to any omission to maintain a proper lookout ahead. The record is such that it cannot properly be said that the court was clearly wrong if it concluded either that the Clematis maintained a proper lookout astern or that any dereliction there may have been in the performance of that duty was not a proximate cause of the collision. The evidence indicated that the person on the Clematis who was charged with the duty of keeping a lookout astern saw the El Monte as soon as it was visible, and as soon as, if not sooner than, any one on the El Monte saw the Clematis, and that this was too late for the collision to be avoided by anything either vessel then could do. If signals from the Clematis gave notice to the El Monte of the presence of a vessel ahead when the latter was hidden from view by the fog, and thereafter the El Monte negligently failed to take suitable precautions to avoid a collision, and the Clematis was not negligent after the imminence of a collision was disclosed to it, the El Monte is to be considered as solely responsible, because it had

the last clear chance to prevent the collision, any antecedent negligence of the Clematis in the matter of a lookout astern being remote, and such as could have made no difference in the result. The Nacoochee, supra; The Bailey Gatzert, 179 Fed. 45, 102 C. C. A. 612; Philadelphia & R. R. Co. v. Klutt, 148 Fed. 818, 78 C. C. A. 508; The Portia, 64 Fed. 811, 12 C. C. A. 427.

We conclude that the assignments of error based on the failure of the court to hold the Clematis liable for part of the loss are not sustainable.

[6-8] The decree awarded to the owner of the Clematis, the Stag Line, Limited, the amount of damages which the court ascertained were caused by the collision, with interest thereon at 6 per centum per annum from the date of the collision. Complaint is made of some of the items allowed. As a result of the collision the Clematis was detained at Galveston, undergoing repairs, from the date of the collision, February 10, 1916, to March 22, 1916. The court allowed for 40 days' detention—excluding the day of sailing—at the charter rate for demurrage, £150 per day. This allowance at that rate is not fairly subject to complaint, as the evidence adduced indicated that, under the conditions existing at the time of the collision and during the period of the detention, the owner could have realized more for the use of the vessel, if it had been available, than was awarded for the period of detention. It is well settled that the loss of profits, or of the use of a vessel, pending repairs, or other detention, arising from a collision, is a proper element of damage. The Conqueror, 166 U. S. 110, 17 Sup. Ct. 510, 41 L. Ed. 937; Galveston Towing Co. v. Cuban S. S. Co., 195 Fed. 711, 115 C. C. A. 438. As the party responsible for the damages resulting from the collision became liable when it occurred, interest on the amount of such damages, if not then paid, was allowable from that date. Galveston Towing Co. v. Cuban S. S. Co., supra. It has not been made to appear that the survey fees allowed by the court were improper or excessive.

[9] The cargo of the Clematis was wheat belonging to the Commission for Relief in Belgium. As results of the collision some of the wheat was lost, some of it was damaged by salt water, necessitating the unloading, drying, reconditioning, and reloading of it, and the remainder of the wheat was not damaged. The owner by intervening petition asserted its claim to damages caused to the cargo by the collision. Complaint is made of that part of the award to the cargo owner which fixed its compensation for the loss sustained on the damaged and reconditioned wheat. On this item the court allowed the difference between the market value of the wheat at Rotterdam, its destination, in sound condition, and the value of the same wheat at Rotterdam in its damaged condition. It is insisted that what the owner lost on the damaged wheat was the difference between its value at Galveston before the collision and its value there after the collision, and that the party responsible for the loss is not chargeable with the value added to the damaged wheat by carrying it from Galveston to Rotterdam.

There might be merit in this contention if it did not satisfactorily appear that the appellant was benefited, and not prejudiced, by having

the loss on the damaged wheat ascertained in the way followed by the court. The counsel for the intervener made a statement to the court to the effect that the damaged wheat, after being reconditioned, was reloaded and shipped to Rotterdam, because it would have been a great sacrifice to have sold it on this side, as it would have had to be sold as storm-damaged wheat, and would have brought only from 20 to 40 cents a bushel. This statement was not objected to and was not controverted. The evidence showed that the damaged wheat, after being dried and reconditioned, was classed by the official grain inspector at Galveston as "no grade wheat." It is to be inferred that the loss on the damaged wheat was lessened by incurring the expense of sending it to Rotterdam. The owner was performing a duty it owed when it adopted the course which would result in minimizing the loss, and was entitled to be reimbursed the expense incident to its doing so. The difference between the value of the damaged wheat at Rotterdam and what it would have been worth there if it had not been damaged as a result of the collision was a sum less than the difference between the value of that wheat at Galveston before the collision and its value there after it was dried and treated. The loss to the party liable to indemnify the owner was reduced by carrying the damaged wheat to Rotterdam and valuing it there, instead of at Galveston. All of the loss on that wheat which was due to the collision, not merely a part of it, was chargeable against the party found to be solely responsible for the collision.

The conclusion is that no one of the complaints against the decree appealed from is well founded. That decree is affirmed.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes