## THE SANDAY.

## THE MICHIGAN.
### No. A–15598.

District Court, E. D. New York.
April 3, 1940.

Mahar & Mason, of New York City (Frank C. Mason, of New York City, of counsel), for libelant.

Macklin, Brown, Lenahan & Speer, of New York City (Leo F. Hanan, of New York City, of counsel), for claimant.

456

BYERS, District Judge.

The barge Sanday, the last vessel in a northbound tow of six light barges, was in collision with the southbound motor vessel Michigan in the Oswego River section of the barge canal on July 24, 1938, and her owner seeks to recover for her damage.

The towing vessel was the Craig, owned by the libelant, and an impleading petition was filed by the claimant of the Michigan; in lieu of answer thereto, it was stipulated at the trial that any fault attributable to the towing vessel should be visited upon the libelant.

The collision occurred between 3:00 and 3:30 p.m. (D.S.T.) on a day when atmospheric conditions played no part, save that there was a light easterly breeze which may have taken slight effect on the high sides of the light barges; however, the evidence fails to establish that it contributed to the collision.

The tow was about 500 feet in length, and there is no criticism as to the power of the Craig; about 20 feet separated her stern from the bows of the two barges in the first tier, which were being towed abreast, as were the two in the second tier; under the stern of the latter were the Hadley and Sanday, in tandem.

The canal follows the winding course of the Oswego River, and this collision occurred about 1,500 feet or so southerly from the southerly end of Walters Island, which lies northerly from Phoenix (lock 1); the winding course of the river from the latter place inclines northwesterly and then northerly until about opposite buoy 30 on the easterly side of the channel, from which it inclines gradually northwest to the southerly tip of Walters Island where the inclination is distinctly westerly for about 1,000 feet.

The foregoing has been taken from claimant's Exhibit A rather than Exhibit B, which is useful only for the purpose of indicating the channel buoys.

As the tow left buoy 27 on her port hand, her course would be slightly west of north, toward buoy 30 on her starboard hand, and that is roughly a distance of 3,000 feet; when the Craig passed the latter, she inclined toward the west, which caused her tow to circle somewhat, as it followed, and such was the appearance of the tow to the Michigan, which had rounded the bend at the south of Walters Island, when she sighted the flotilla at a distance, as stated by her navigating officer, of 1,700 to 1,800 feet.

The captain of the Craig said that he saw the Michigan as he was about abreast of buoy 30, so that they came into mutual sight at a distance of from 1,700 to 2,000 feet, and it is thought that the only question for determination is whether the navigation of the Michigan was prudent, and calculated to avoid the striking which actually happened.

The latter is 254 feet long by 36 feet in beam, and being laden, she drew about 10 feet; she was proceeding at full speed, which her navigating officer put at from 4 to 4¼ miles an hour. There can be no criticism of her for maintaining that headway until sighting the tow, because at a distance northerly from the southerly end of Walters Island of about 1,750 feet (i.e., 4 to 5 minutes, as her mate said, before emerging from Walters Island cut) she had blown a bend whistle, to which no answer was given.

The westerly banks are about 25 feet high in that reach of the river, and the bend signal was required of the Michigan, but it is not necessarily a cause for wonder that it was not heard on the Craig which was then about 3,750 feet distant, hidden from the view of the Michigan.

The Craig is criticised for not having also blown a bend whistle when she was about off buoy 30, which is near enough to half a mile below the bend to have required her to do that (Title 33 U.S.C. § 203, Rule V, 33 U.S.C.A. § 203, rule V) but if the Michigan signal was not heard on the Craig, it is reasonable to infer that the same lack of result would have attended the Craig's performance of her statutory duty.

Rounding the bend opposite buoy 32 on the easterly edge of the channel, the Michigan saw the Craig and her tow in the position which has been stated, with the last vessel tailing over to her own port hand and in the expectable path of the Michigan.

It is presently the view that there was nothing inevitable about this collision, and that it could have been avoided, had the Michigan not delayed reducing her speed.

The Craig said that she blew one whistle to the Michigan as the latter was coming out of the cut at Walters Island, which the Michigan answered with one, so that each vessel thereby agreed to adhere to her own starboard hand. The Craig's testimony is accepted.

The navigator of the Michigan denies this exchange, and says that he blew one on sighting the Craig and that this occurred when the tug was from 1,700 to 1,800 feet away. Roughly, the tug was seven ship-lengths from the Michigan at that time, from which it was observed that the tug was in the middle of the river but the barges were not following straight.

One-half of the channel, which is about 200 feet wide in these waters, was closed to navigation because of dredging operations, but the testimony is quite obscure as to whether it was the easterly or westerly half of the channel which was thus out of service; it is thought that liability should not attach by reason of that doubt, because both the Craig and the Michigan seem to have navigated in the belief that it was the westerly half of the channel which was closed, so that the Michigan proceeded southerly close to the center line of the channel, passing the buoys which marked that portion close aboard to starboard; in fact, she says that she rubbed one along her starboard side and eventually passed over it in her efforts to avoid the collision.

If both navigators were mistaken in adhering to the easterly half of the channel, then neither can urge fault against the other on that account, and the subject has not been deemed of importance to the decision.

Coming back to the navigation of the Michigan, the following appears in her navigator's testimony:

"I didn't get no reply to that (the one whistle) so I stopped my starboard engine and went slow ahead on the port engine. When I noticed the way the tug was navigating the river, that is, I noticed the tug was in the middle of the river all right, but the barges they weren't following straight. So I backed on my starboard engine to take the way off the boat, so when I met the boat I would meet him at the proper speed.

"* * *

"Q. And you made these engine movements at the time you blew one or after you blew one? A. After I blowed the first signal.

"Q. How long after you blowed the first signal? A. Oh, it was but a minute or so after."

In that minute the Michigan must have covered 350 feet and the tow 176 feet (her speed was said to be two miles an hour with a current under foot of from one-half to three-quarters of a mile) so that it appears that the delay of that one minute was responsible for the collision.

The Sanday was struck at about or a little forward of amidships, so that contact was not avoided by a matter of less than 60 feet, and if the heading of the Michigan had been altered a half minute sooner than it was, the collision would not have occurred.

It may be that a movement of the helm would have helped, but it would be difficult to say that this is so; counsel endeavored to insert some testimony in a query which took the form of a recitation, but there is no real evidence on the subject. Clearly the Michigan was as close to the line of buoys as she thought it was safe for her to go; she expected to avoid contact with the Sanday through the control of her engine movements, which have been only partially stated. Her testimony is that, after the starboard engine was put astern and the port in slow ahead, and the Craig was 25 to 30 feet on the Michigan's port bow, the Michigan blew the danger signal, and her speed was then reduced to steerage way only against the current.

In spite of the delay of the Michigan in arresting her progress at full speed, she would not be held at fault if it could be seen that the navigation of the Craig and her tow should be criticised. It is true that the Sanday was inclining to the westerly channel just before the collision, as her captain says, but having in mind the necessary course of the tow in following the winding channel, it is thought that this could not have been avoided.

When the Craig was abreast of the Michigan, her captain realized, as he expressed it, that the tow was "bellying out", namely, the last barge was tailing to port, and that it was his duty to correct that condition if he could, and he changed his heading to port, toward the westerly side of the river, and took a strain on his starboard hawser so as to snap the Sanday out of the path of the Michigan, and he maintained his full speed for that purpose, so that he did what he could to avoid the collision, but without avail.

The result is that there can be no finding of faulty navigation on the part of the tow, while there was delay on the part of the Michigan in reducing her own headway, as has been stated, and therefore the margin of fault—slight as it is—must be found against her.

None of the authorities cited for the claimant points to a different conclusion.

The finding is that the Craig was navigated properly, in view of all conditions; and that the Michigan had ample opportunity to avoid the collision, but failed to promptly reduce her forward movement from full speed ahead, when the peril of the situation was apparent to her navigator, and continued at that speed too long to enable her to avoid striking the Sanday.

The libelant may take the usual decree, to be settled on notice.