THE JAMESTOWN.

ERIE R. CO. v. UNITED STATES.

THE GEORGE E. BADGER.

District Court, S. D. New York.
Dec. 27, 1945.

Hagen & Eidenbach, of New York City (Charles W. Hagen and Nelson J. Johnson, both of New York City, of counsel), for Erie R. Co.

John F. X. McGohey, U. S. Atty., of New York City (Vincent A. Catoggio, Sp. Asst. to U. S. Atty., and John F. Quarto, both of New York City, of counsel), for the United States.

COXE, District Judge.

These suits grow out of a collision between the Erie Railroad ferryboat "Jamestown" and the Liberty ship "George E. Badger," which occurred in the Hudson River a short distance off from the Erie Railroad ferry slips at Pavonia Avenue, Jersey City, at about 8:25 P M. on March 6, 1943. It was dark at the time, the visibility was fair, the tide was strong flood, and there was a strong wind blowing from the south with a velocity of about 45 miles.

The "Jamestown" was on a regular run from Chambers Street, Manhattan, to the Erie Railroad Terminal, Jersey City. The "Badger" was loaded, and anchored in the Hudson River pursuant to Coast Guard instructions preparatory to leaving for Europe in convoy. As a result of the collision the "Jamestown" sustained considerable damage on her starboard side, and the "Badger" was damaged on her port bow.

The "Badger" is 441 feet long, her bridge is amidships, and at the time of the collision she was showing proper anchor lights. The vessel was in charge of Reed, the third mate, who was in the chart room when the collision took place, and did not see the "Jamestown" until after the vessels came together. Reed testified that an ordinary seaman named Carlino was on the starboard wing of the bridge but that otherwise there was no one on watch on the vessel. Carlino was not called as a witness, nor was his absence accounted for. The position of the vessel at the time of the collision is shown by the bearings taken after the collision and recorded in the log. These bearings were given by the United States in its answers to interrogatories as the exact location of the "Badger" at the time of the collision. At the trial, the bearings were plotted on the chart (Ex. 7), and place the vessel about 590 feet off the end of Pier 4, Jersey City, and directly in front of the Erie Railroad ferry slips. Pier 4 is just north of the ferry slips.

It is difficult to reconcile the position of the "Badger," as disclosed by these bearings, with the testimony of Pilot Oldmixon, the Coast Guard officer who anchored the vessel on the flood tide at 8:10 A. M. on March 5th. Oldmixon testified that when he left the vessel she was anchored with about three hundred feet of chain in the water, and that her position was between "eleven and twelve hundred feet off the Jersey shore" and "a good two and a half of three ship lengths south of the ferry rack." There is nothing in the evidence to indicate that the "Badger" dragged her anchor after she was anchored, and I think her position, as determined by the bearings, must be accepted as her position on the flood tide during March 5th and 6th. That was where Captain Wolfer, the master of the "Jamestown," found her on numerous runs he made on the flood tide on both days, and the position squares with the testimony of other witnesses for the "Jamestown."

The "Jamestown" left Chambers Street at 8:20 P. M. on March 6th on a regular run to Jersey City. Captain Wolfer, the master, and Captain Palmer, the wheelsman, were in the pilot house, and Van Wezendek, a deck-hand, was acting as lookout on the port bow. Due to the abnormally high flood tide, only Slip No. 1 was available at the time for use at the Jersey City Terminal, and that fact was known to those on the "Jamestown" before the ferryboat left Chambers Street.

The "Jamestown" headed diagonally across the river to cross the bow of the "Badger" and then pass between the

"Badger" and the New Jersey shore to Slip No. 1. The vessel first ran slow and then full speed ahead, and, after clearing the bow of the "Badger" it was seen that the ferryboat "Tuxedo" was still in Slip No. 1. The "Jamestown" thereupon slowed her engines but continued ahead. Captain Wolfer said that at that time a heavy gust of wind from the southwest struck the "Jamestown" and caused her to veer towards the "Badger." The "Jamestown" then went full speed astern and sounded an alarm; the result was that with the wind and the tide she brought up on the "Badger's" anchor chain, and swung completely around and struck the "Badger's" port bow. A period of from two to three minutes elapsed from the time that the "Jamestown" sounded her alarm until the collision.

During the time the "Badger" lay at anchor, ferry service to the Erie Railroad Terminal continued without interruption. Captain Wolfer testified that he made his regular runs from Chambers Street on 10 and 15 minutes headway from 3 P. M. to 11 P. M. on March 5th, and from 3 P. M. to the time of the collision on March 6th. On the flood tide on both days the "Jamestown" reached the Jersey City slips without difficulty by crossing the "Badger's" bow.

1. The "Badger" was clearly at fault for her anchorage, since she unnecessarily obstructed the passage of vessels to and from the Jersey City ferry slips, 33 U.S.C.A. § 409. Indeed, Oldmixon, the Coast Guard officer who anchored the vessel, admitted as much when he said that it would not be proper to anchor a vessel of the size of the "Badger" "abreast of the ferry slip" and "six to eight hundred feet out." This improper anchorage of the "Badger" did not, however, "justify other vessels in running into her." The Pocahontas, 2 Cir., 235 F. 116, 117. Nor is it enough in itself to fasten liability on the vessel unless it was a "cause" and not a "condition" of the collision. The Perseverance, 2 Cir., 63 F.2d 788.

2. I think the "Badger's" anchored position in front of the Jersey City ferry slips was a "condition" and not a "cause" of the collision. Captain Wolfer, the master of the "Jamestown," had no difficulty in reaching the Jersey City Terminal on his previous runs on the flood tide, and in each instance he crossed the bow of the "Badger"; he knew the exact position of the "Badger" before he left Chambers Street, and he said that this position was the same as on his previous runs on the flood tide; he knew also that only Slip No. 1 was available at the Jersey City Terminal, and that there was a strong likelihood that this slip was already occupied by the ferryboat "Tuxedo." Yet he maneuvered the "Jamestown" across the bow of the "Badger" without ascertaining that Slip No. 1 was open; he then saw for the first time that the slip was occupied by the "Tuxedo," and, in an effort to extricate himself, was carried by the wind and tide on to the anchor chain of the "Badger," and subsequently into the collision. The fault of the "Jamestown" was in proceeding across the bow of the "Badger" without knowing that Slip No. 1 was open; this was taking a chance under known conditions, and it is not to be excused by the heavy gust of wind which, Captain Wolfer said, struck the ferryboat after she cleared the "Badger's" bow. See The Philip J. Kenny, 3 Cir., 60 F.2d 457, 458.

3. The "Badger" was also at fault for failure to maintain a proper watch. Her position in the river was such as to require her "to maintain a vigilant anchor watch, ready to give her chain or sheer her clear of an approaching vessel." The Richmond, 2 Cir., 63 F. 1020, 1022. She had no anchor watch, and nothing whatever was done to let out her anchor chain during the interval of two to three minutes which elapsed between the "Jamestown's" alarm and the collision. The vessel still had about 70 fathoms of chain on the windlass, and Reed, the third mate, testified that the brake could have been released in "less than half a minute." Reed also said that on the release of the brake the chain would have dropped down almost instantly, and, with the tide and weather conditions then existing, would have run out "very rapidly." On this showing, I think it is clear that if there had been a vigilant anchor watch the collision might have been avoided, or, at least, the damages might have been mitigated. The Richmond, supra. It is no answer that the release of the chain might have entangled the "Badger" with the "Tuxedo," as there still would have been sufficient space for the "Tuxedo" to navigate if she had come out from the slip.

There may be decrees in both suits holding both vessels at fault, and for divided damages, without costs.