## THE YUCATAN.

(Circuit Court of Appeals, Ninth Circuit. August 9, 1915.)

No. 2578.

1. COLLISION ⬅70—MOVING AND MOORED VESSEL—VESSEL LYING IN FAIRWAY.

That a vessel is lying moored in the fairway, where she has no lawful right, is not a bar to recovery for her injury in collision, where the moving vessel, by proper navigation and the exercise of reasonable care, could have avoided the collision.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 91–100; Dec. Dig. ⬅70.]

2. NAVIGABLE WATERS ⬅20—DRAWBRIDGES—REGULATIONS FOR OPENING DRAW.

Act Aug. 18; 1894, c. 299, § 5, 28 Stat. 362 (Comp. St. 1913, § 9973), regulating drawbridges over navigable streams, and the regulations of August 4, 1910, made thereunder, which provide that an approaching vessel, when "not less" than 1,000 feet distant, shall signal for the opening of the draw, must be construed as requiring the vessel to signal when approximately 1,000 feet distant, and where appreciably farther away when the signal is given the opening of the draw by the time she is within 1,000 feet is a compliance with the regulation.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 73–99; Dec. Dig. ⬅20.]

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. COLLISION ⊚⟶74—MOVING AND MOORED VESSEL—FAULT.
    Evidence *held* to sustain a finding that a collision between moving and
    moored vessels was due solely to the negligent handling of the moving
    vessel and her failure to have a licensed pilot.

    [Ed. Note.—For other cases, see Collision, Cent. Dig. § 104; Dec. Dig.
    ⊚⟶74.]

Appeal from District Court of the United States for the District of Oregon; Robert S. Bean, Judge.

Suit in admiralty for collision by the State of Oregon against the steamship Yucatan, the North Pacific Steamship Company claimant, with cross-libel against the State of Oregon and Multnomah County. Decree for libelant, and claimant appeals. Affirmed.

Sanderson Reed and C. A. Bell, both of Portland, Or., for appellant.

A. M. Crawford, Atty. Gen., and J. A. Beckwith, of Portland, Or., for appellee State of Oregon.

Walter H. Evans, Dist. Atty., and George Mowry, both of Portland, Or., for appellee Multnomah County.

Before GILBERT and ROSS, Circuit Judges, and RUDKIN, District Judge.

RUDKIN, District Judge. At midday on the 3d day of March, 1914, the steamship Yucatan was lying alongside the Globe Milling Company dock on the east side of the Willamette river in the Portland harbor, headed south, or upstream. The north end of the dock, is 1,300 feet south, or upstream, from the Broadway drawbridge spanning the Willamette river. The stern of the vessel was about 40 feet south of the north end of the dock. The United States steamship Boston, under lease to the state of Oregon, was lying at her moorings in the Willamette river between the Yucatan and the drawbridge. At the time in question the master of the Yucatan undertook to leave the dock and pass down the river through the drawbridge. In so doing a stern spring line was extended from the offshore quarter on the starboard side of the vessel around the stern and fastened to a cleat on the dock about midships. All other lines were cast off, and the engine started up slowly, thus keeping the stern spring line tight, drawing the vessel up the dock, and swinging the bow away from the dock. As soon as the vessel had swung away from the dock to an angle of about 20 degrees the signal to open the draw of the Broadway bridge was given; but the signal was not heeded, nor was any signal displayed showing that the draw could not be operated. When the vessel had swung off to an angle of about 90 degrees from the dock, a second signal for the draw was given, with the same result. The danger signal was then given, and the draw was opened soon thereafter. At an angle of about 120 degrees from the dock the line was cast off and the vessel proceeded full speed ahead. In so doing, however, the vessel collided with the protruding guns of the Boston, causing injury to the guns and their casings, and totally destroying a piano on board the ship.

The present libel was filed by the state of Oregon against the steamship Yucatan, and her engines, boilers, tackle, apparel, and furniture, to recover damages for the injury thus sustained. The North Pacific Steamship Company appeared as claimant, and filed a cross-libel against Multnomah county, claiming damage for injury received by the Yucatan in the collision by reason of the failure of the bridge tender to open the draw upon proper signal. Issues were made up, and the following charges of negligence were laid against the different parties:

First. Negligence on the part of the state of Oregon in mooring the Boston in the fairway and in permitting the guns to protrude beyond the rail.

Second. Negligence on the part of Multnomah county in failing to open the drawbridge in obedience to the signal given for that purpose.

Third. Careless and negligent handling of the Yucatan by the master and failure to have a licensed pilot on board.

The court below found that the proximate cause of the collision was the careless and negligent handling of the Yucatan and the failure to have a licensed pilot on board familiar with the winds and currents. A decree of condemnation was thereupon entered against the vessel for the damages sustained by the Boston, and dismissing the cross-libel against Multnomah county. From this decree the libelant has appealed.

[1] 1. Assuming that the state of Oregon was guilty of negligence in mooring the Boston in the fairway, and in permitting her guns to extend beyond the rail, in violation of the ordinances of the city of Portland, such negligence would not bar a recovery if the collision could have been averted or avoided by the exercise of reasonable diligence on the part of the officers of the Yucatan. A person does not invite the destruction of his property simply by leaving it exposed in a public place, even though his act in so doing may create a public nuisance. It is admitted that the Boston lay in the same position for several months preceding the collision, that she and her guns were in plain view, and that the Yucatan could have passed out of the harbor without collision or injury by the exercise of reasonable care on the part of the master, unless the negligence of the county in failing to open the drawbridge caused or contributed to the injury in such measure that the master could not have avoided the pending collision by the exercise of reasonable care on his part. The negligence of the state, if negligent at all, would not bar a recovery, unless such negligence caused or contributed to the injury.

[2] 2. The negligence of Multnomah county depends upon the construction of the act of Congress, and the regulations of the War Department made pursuant thereto. Section 5 of the Act of August 18, 1894 (28 Stat. 362), provides as follows:

"That it shall be the duty of all persons owning, operating, and tending the drawbridges now built, or which may hereafter be built across the navigable rivers and other waters of the United States, to open, or cause to be opened, the draws of such bridges under such rules and regulations as in the opinion of the Secretary of War the public interests require to govern the opening of drawbridges for the passage of vessels and other water crafts, and such rules and regulations, when so made and published, shall have the force of law.

Every such person who shall willfully fail or refuse to open, or cause to be opened, the draw of any such bridge for the passage of a boat or boats, or who shall unreasonably delay the opening of said draw after reasonable signal shall have been given, as provided in such regulations, shall be deemed guilty of a misdemeanor.  *  *  * "

Sections 1 and 2 of the regulations promulgated under this act, effective August 4, 1910, are as follows:

Section 1: "When at any time during the day or night a vessel, unable to pass under the closed drawspan of any one of the above bridges, approaching it from a distance of over 1,000 feet, the person in command of such vessel shall cause to be sounded, when said vessel shall be at a distance of not less than 1,000 feet, the prescribed signal and shall repeat this signal until it is understood at the bridge."

Section 2: "When such vessel is about to leave a landing 1,000 feet or less from the drawbridge, with the intention of passing through the draw, the person in command shall cause the prescribed signal to be sounded at such interval before leaving the landing that the draw may be opened in time for the vessel to pass."

Section 6 provides that upon hearing the signals the engineer or operator of the drawbridge shall promptly open the draw, with certain exceptions not material here.

The Yucatan was not about to leave a landing 1,000 feet or less from the drawbridge, and the case, therefore, falls within the provisions of section 1. That section is somewhat indefinite. It will be observed that it fixes the minimum distance, but prescribes no maximum. A signal given at a distance of 2 or 3 miles from the bridge would be a literal compliance with the regulations, and under section 6 the engineer or operator of the bridge must promptly open the draw. This, however, would be an unreasonable construction of the regulation. The right of navigation does not take away the right to cross the river. The two rights coexist, and each must be exercised with reference to the other, just as the right to travel along the street is qualified by the right to cross it. The navigator must yield something to the foot passenger, just as the latter must yield something to the navigator. Gilman v. Philadelphia, 3 Wall. 713, 729, 18 L. Ed. 96.

At the time the first signal was given the Yucatan was more than 1,300 feet distant from the drawbridge and was headed in the opposite direction. According to the testimony of the appellant, the draw was not opened for from 14 to 19 minutes after the first signal was given. Yet the draw was actually open before the vessel approached within 1,000 feet of the bridge, and it does not appear that its approach was delayed materially, if at all, by the failure to sooner open the draw. Had the draw been opened immediately upon the giving of the first signal, it would have remained open and an obstruction to public travel across the bridge for almost half an hour in order to allow this single vessel to pass. Such an obstruction to travel across the bridge is in our opinion unauthorized and unnecessary. Escanaba Co. v. Chicago, 107 U. S. 678, 682, 2 Sup. Ct. 185, 27 L. Ed. 442.

The testimony clearly shows that the draw was in fact open before the vessel approached within 1,000 feet of the bridge, and this would seem to be a reasonable and practical compliance with the statute and

the regulations. But, if there was some unnecessary and unauthorized delay in opening the draw, the question would still remain: What act of negligence was the proximate cause of the accident?

[3] 3. The court below found that the proximate cause was the careless and negligent handling of the Yucatan, coupled with the failure to have a licensed pilot on board familiar with the river, the winds, and the currents. The rule is well established that the findings of the trial judge in admiralty will not be set aside, except for clear manifestation of error. An examination of the record convinces us that the findings on the question of negligence and proximate cause are fully warranted by the testimony, and the decree is accordingly affirmed.