### THE PERSEVERANCE.

#### THE WINNETOU.

#### Nos. 220, 221.

Circuit Court of Appeals, Second Circuit. March 6, 1933.

Crowell & Rouse, of New York City (E. Curtis Rouse, of New York City, of counsel), for the steamship Winnetou.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City (Robert S. Erskine and Henry P. Elliott, both of New York City, of counsel), for the tug Perseverance.

Courtland Palmer, of New York City, for libelant.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The steamer Winnetou with a cargo of molasses, consigned to the Fleischmann Company, came to anchor in the fairway of the Hudson river off Peekskill on November 25, 1928. The customary anchorage for vessels of her draught, which were obliged to use the fairway—there being no anchorage ground—was considerably to the south and east of that selected by the pilot who had her in charge. Her precise position was in dispute and the judge did not fix it, beyond saying that she was far beyond where she should have been, and impeded navigation. We find that she was about one hundred feet east of the thread of the fairway, which, measured from the three fathom line to Kidds Point, was about twenty-five or twenty-six hundred feet wide. As to her location up and down in the stream, we accept as most probable the range given by the witness, Robinson, which is independ-

ently corroborated. This would place her somewhat below Kidds Point, and not to the north of it, where the claimant of the tug puts her. We agree with the judge that in so anchoring, she unnecessarily obstructed the channel and was at fault. Our only difference with him is in the legal consequences which follow.

The tug Perseverance, an exceedingly powerful vessel, with a helper was bound down through the Highlands. She had in tow a block of forty-one barges made up close, in ten tiers, four abreast, on a hawser of eighty fathoms; the tug was one hundred feet long, the ten tiers about eleven hundred feet; the whole tow, seventeen hundred. The Hudson makes a bend to the eastward at Anthony's Nose about two and a half miles above Kidds Point, and flows in a straight reach to Peekskill Bay, where it again turns, this time at about a right angle to the west, to round the Donderberg. Kidds Point is the elbow on the west shore. As the tug opened up the reach to Peekskill at Bear Mountain Bridge, she saw the Winnetou at anchor. She did not then make this out, nor did she learn it until she was close aboard, though it was a clear day and not much past noon. She asserts that she was misled by smoke coming from the ship, and this we will accept, though not as an excuse. Even on the ebb which ran at between two and three miles, she took half an hour to reach Kidds Point, and indeed her master lengthens this period. During all this time the ship was motionless, a circumstance which should have at least stimulated more scrutiny than the tug made; she could certainly have made out the truth at more than a quarter of a mile off.

The tug had been in mid stream until a point not more at most than a quarter of a mile above the Point, when she ported over to the west shore, giving the Point, as she says, a berth of about two hundred feet. The tow under the combined effect of the tide and the port helm, fell upon the bows of the ship, which was headed into the ebb. The collision was about midway of the tow's length and broke the barges apart so that about one half drifted on either side of the ship, which had ineffectually veered cable in extremis in the hope of giving more room, or at least easing the blow. Assuming that the Winnetou was about one hundred feet east of the centre of the fairway, the navigable water for the tow was at least thirteen hundred feet; for the evidence shows that the tug could have gone within fifty feet of the shore. There is indeed testimony that the ebb makes

to the west above Kidds Point and then flows straight past it towards the east shore, only turning to the west somewhat below. We may accept this and therefore agree that a tow cannot be made to follow the tug's course in rounding the Point. Indeed this seems most likely, since the tug loses the tide after she turns. The judge found both vessels at fault, and each liable for the result; both complain.

■ As to the tug we can see no escape. We do not believe that she could have come within two hundred feet of Kidds Point on her turn. This gave a distance of at least eleven hundred feet between her and the ship. The length of the tow being seventeen hundred feet, and the collision being at a point some five or six hundred feet forward of its last tier, the tow would have been broadside to the stream for this to happen. Thus, the tug manifestly did not come as near the Point as she supposed, and Closkey, the pilot of the helper tug, says that she passed the ship by only eight hundred to a thousand feet. We think she was closer aboard than that. We are quite sure therefore that her navigation was in fact tardy and negligent. It does not follow, however, that there was space enough to swing the tow whatever care was used; but we think there was. If the tug had turned the Point fifty feet off, there would have been nearly thirteen hundred feet between her and the ship, as we have said. The tow, eleven hundred feet in length, was substantially a single craft. From the stern of the tug to the first tier was about five hundred feet. The tow and hawser would have to fall off over forty-five degrees from the tug's course after she turned the Point, for even the last tier to collide. The tide was of about the same speed as the tug, and if the tug lost it at once upon turning the Point, the tow would move in about a circle until it too passed the Point. It would turn on a point not determinable à priori, the tail swinging more than the front. But if the tug had brought it near the west shore further up stream, it seems to us impossible that the last tier should have been thirteen hundred feet from the shore. The tail, once brought well on the west side of the channel, would have had to lurch across under the tide, though constantly pulled to the westward after the tug turned the Point. That we do not believe and there is testimony to support our conclusion. Though the tide above the Point may set towards the west shore, allowance could be made for that by a skillful navigator, so as to bring the front tier close around the Point. Had this been done, the tail could not have touched the ship.

■ As to the ship, we are disposed to exonerate her, though she was at fault as we have said. We accept the common form of statement that the fault must be a "cause," not a "condition," of the collision. By that, as we said in The Socony No. 19, 29 F. (2d) 20, we mean that although the fault was a cause, in the sense that it was a part of those circumstances necessary to the occurrence, the tug was amply advised in advance of the ship's position, and could have avoided her by proper navigation. The situation is similar to that often comprised within the formula that a wrongdoer is solely liable if he has a "last clear chance" of avoiding the damage. More concretely, we think that the tug should have known that the ship was at anchor before she did, and that if so, she could have come in towards the west shore further up, at about Round Island for example. This, as we have just explained, would have put her in a position to round Kidds Point without fouling the ship. It is to us incredible that so powerful a tug with a helper and thirteen hundred feet of channel, could not have kept her tow in her own waters. Hence we hold her alone at fault. When all is said, the fact remains that on a clear day she fouled an anchored vessel which she had had under observation for at least half an hour. Nothing sudden or untoward intervened; the passage was one to which she was accustomed; for which the tow was made up. Presumably, it was not designed to occupy more than that share of the waters to which it was entitled under Article 25. The fault seems to us to be rather one of navigation with the means at hand, than the alternative, that is, making up a tow which could not be managed lawfully at all, which might justify divided damages. It must be remembered that the helper was sent behind to push off the tow on the east side, whose added power proved insufficient, due as we think to the original errors in navigation.

Decree modified to hold the tug alone. •