**12**

Mahar & Mason, of New York City (Frank C. Mason, of New York City, of counsel), for libelants.

Edward R. Brumley, of New York City (Edmund J. Moore, of New York City, of counsel), for respondents.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for claimant.

BYERS, District Judge.

These causes were tried together by consent, and arise from damage sustained by the loaded barges Marine and L. Monk, in tow of the steamtug S & H No. 2 northbound in the Harlem River, on January 16, 1941, about 11:10 a.m. The Marine was the head barge in a tandem tow, and was caused to strike the southerly end of the Bronx abutment of the Willis Avenue Bridge, about 8 to 10 feet in from her port corner, on the bow. The Monk thereupon struck the leading barge, and both were damaged.

The facts as above are not in dispute. The libelants sued not only the tug, but the Trustees of the New York, New Haven and Hartford Railroad Company, and undertook to prove that a tug of the latter was responsible for the damage, since the Transfer No. 20, which was lying bow in at the dock in the railroad yard (which contains a repair shop) about 275 feet below the bridge on the Bronx side, was working her engines and thus caused quick

**THE MARINE.**

**THE S & H NO. 2.**

**THE L. MONK.**

**TUCKER v. PALMER et al.**

**SWENSON v. SAME.**

Nos. 16267, 16268.

District Court, Eastern District of New York.

May 12, 1942.

water to move toward the Manhattan shore in such force and volume as to cause a sheer in the tow; that the greater force was exerted on the second barge, causing her to veer so strongly to her own port that the leading barge headed into and struck the abutment, with the result stated.

It seemed somewhat unusual for the vessels in tow to assume this double burden, since all that was required of them, to charge the tug, was the fetching on the abutment, leaving it to the latter to exonerate herself as best she might.

For the respondents, the proof is of expectably negative import. The libels were filed on May 29, 1941, and charged that the offending tug was maneuvering "above the bridge". The only vessel of respondents which could have been culpable under that allegation was the Transfer No. 21, which was engaged at about 11:05 a.m. in moving a stick lighter made fast to port, from the dock in the repair yard to a point above the bridge. She did this by backing out and proceeding up stream. Her master made a report to his owner on August 25, 1941, which showed no implication in or knowledge of the mishap to libelants' barges.

That was the state of affairs until the eve of trial, and justified preparation on the theory advanced in the libels.

The answers for the tug, filed April 11, 1942 (the case was heard on the 13th) averred that "Approaching the Willis Avenue bridge a tug operated by the respondents was observed with its stern near the starboard draw and its wheel (propeller) turning".

Thus the respondent Trustees were tardily confronted with having to meet testimony that the alleged offending tug was either above or below the bridge.

The evidence is deemed to establish:

1. On January 16, 1941, a tow, consisting of the steamtug S & H No. 2, 80.5 feet long and 21.7 feet in beam, the loaded barge Marine, 108 feet long, 29.6 feet in beam, and having 13 foot sides, and the loaded barge Monk, 90 feet long, 28 feet in beam, and having 14 foot sides, was moving northerly on the starboard side of the Harlem River, bound from 96th Street to 137th Street. The Marine was on two hawsers from the tug, and about 25 feet separated the vessels; the Monk's two hawsers were made fast on the Marine, and from 3 to 5 feet separated these barges.

2. When about 500 feet below the Willis Avenue Bridge, the Captain of the tug observed quick water proceeding from the stern of a tug lying bow in on the northerly side of a dock in the New Haven Railroad yard on the Bronx side of the river, which dock is about 275 feet south of the Willis Avenue Bridge.

3. He blew an alarm signal, and thereafter followed it with three others in rapid succession, but the flow of the quick water was not abated or stopped.

4. The tow was moving at full speed, with a tide under foot of 2 miles an hour, making a speed over the ground of about 5 miles. Neither wind nor weather affected the navigation of the tow.

5. The tow was headed for the starboard passage under the bridge, which is about 250 feet wide between the center abutment and the bulkhead on the Bronx side of the river.

6. The impact of the quick water on the side of the barges successively threw the tow out of shape, causing the Marine to head for the Bronx abutment when the full force of the lateral pressure of the quick water took effect upon the Monk.

7. Because of the presence of other vessels at the Manhattan bulkhead, this tow could not change its course to proceed through the passage under the bridge on that side, which is about 100 feet wide, without danger of collision between them and the barges in this tow.

8. This tow could not stop and back under the conditions existing, nor was there room for it to turn around and head southerly to avoid the hazard created as stated in Findings 6 and 7.

9. The S & H No. 2's rudder was turned hard left and then hard right, and speed was increased in the effort to straighten the tow, which got out of shape in the quick water, when it was realized that the flow of the latter was continuing in full force, but without success; the Marine struck the Bronx abutment at the southerly side, about 8 or 9 feet inboard from her port corner, on her bow. The bow of the Monk was thus caused to strike the Marine, and both barges were damaged as a result.

10. The tug S & H No. 2 has not been shown to have been guilty of the negligent navigation charged in the libel, or of the faults therein specified.

**14**

### Conclusions of Law

I. The libelants are entitled to a decree with costs against the respondent Trustees.

II. The claimant of S & H No. 2 is entitled to a decree without costs, dismissing the libels.

### Discussion .

■ Obviously the decree directed to be entered is somewhat unusual in form, and yet it seems to be required by the pleadings and proof. Had the libelants pursued the conventional method of alleging and proving only damage while in tow, their primary relief would have been against the tug. However, they chose to assert neglect and want of care, as specified, on the part of the tug, and then proceeded to prove that the real cause of their damage was the neglect of the respondents' tug, an exterior agency.

This of course negatived the cause against the towing vessel. Since the libelants are deemed to have sustained their burden of proof, it is thought that their decree must conform to the proof which really constituted a joint effort by the libelants and the towing vessel.

■ On the merits, it is necessary to confess that circumstantial rather than direct proof must· be relied upon, and the preponderance is by no means robust.

It is necessary to start with the assumption that the towing vessel was properly manned and equipped, and that her captain was an experienced and competent master, holding a seasoned license. Further, that only unusual circumstances could account for the shape in which the tow found herself, practically athwart the stream just as the passage under the bridge was at hand.

The two barge captains spoke of seeing quick water coming from a tug lying at a dock on the Bronx side; the captain of the Monk said she was above the bridge, however, while the captain of the Marine saw her just ahead. As the barges. were then moving toward the abutment on which the Marine fetched (see her · survey), a tug lying 250 feet or so south of that would be in their range of vision.

Their testimony was convincing in this, that they agreed upon the slackening of' the starboard hawser to the Monk, to cause her to angle to port and thus tend to steer the Marine past the abutment without contact. That would be the natural thing to do, even though it seems to have failed.

The witnesses for the tug gave an expectably uniform version of seeing the New Haven tug at her dock, and quick water issuing from under her stern across the river. All hands agreed as to the alarm signals.

Perhaps the Court has fallen too easily into the belief that the tug did all that could be expected of her to avoid the striking. The law justly puts upon her the burden of convincingly demonstrating that she omitted no requisite skill of seamanship, and opinions may differ as to whether that has been shown. The only testimony as to that is found in the approving words of the captain and the mate on the witness stand. At least they were there, saw what happened, and were not discredited on the stand.

Presently, there is possessed no resource of inner light to dissolve their assertions' that nothing could have been done by way of stopping or turning, or whipping the tow over for passage in the narrower waters on the Manhattan side of the river under the bridge.

The showing against the New Haven tug Transfer No. 20 may well be deemed argumentative, at best. Such indeed it is.· She was at the dock in question, having about completed engine and boiler repairs extending over many days. She left on the 18th and her engines could have been undergoing a test on the 16th. No one says that this did not occur; the strongest assertion for her is that no one can recall that it did, and no one on board on the 16th heard any alarm whistle, or observed the mishap to the damaged tow.

If it was the duty of either the libelants or the tug to identify with clarity the Transfer No. 20 as the vessel propelling the quick water, assuredly their evidence fails. If they have done enough in showing that a New Haven tug, bearing the word "Transfer" on her stern, was the effective cause of the quick water, then their evidence is sufficient, for the characteristic structure, colors and funnel marking of a tug of the respondents have been clearly identified as the agency of lateral turmoil in the path of the tow.

The evidence does not loudly proclaim the necessary course of adjudication, but the sound is thought to be sufficiently audible to justify this decision.

Settle usual interlocutory decree on notice in accordance with the conclusions of law.