**W. A. RICHMOND, Libellant,**

v.

**THE Tugs CONNIE C. CENAC and THE LA CACHE, their engines, furniture, apparel, etc., and Cenac Towing Company, Respondents.**

**No. 3110.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Dec. 23, 1957.

Phelps, Dunbar, Marks, Claverie & Sims, George Healy, III, New Orleans, La., for libellant.

Lemle & Kelleher, Charles Lugenbuhl, Shirley Friend, Jr., New Orleans, La., for respondents.

J. SKELLY WRIGHT, District Judge.

On November 22, 1955 at 9:45 A.M., the Crew Boat Dos Nietas, owned by W. A. Richmond, was in collision with the Continental Drilling Barge No. 6. The barge was aground at the time and the Tugs LaCache and Connie C. Cenac, both operated by the respondent, Cenac Towing Company, Inc., were attempting to free it from the strand. Richmond filed a libel against the two tugs in rem and against the respondent in personam, alleging that the tugs were responsible for the collision. Respondent claimed the tugs and answered the libel denying responsibility.

The Crew Boat Dos Nietas was 45′ in length, 12′ in beam, with an unladen draft of 3½′. Her two Diesel engines were 200 HP each, giving her a speed in excess of 20 m. p. h. On the morning of the collision, she was proceeding south in the channel in Four League Bay with her certified motor boat operator, Arcement, at the helm. She was seaworthy in all respects.

Four League Bay is one of the many shallow bodies of water which dot the marshland of Louisiana. Through the middle of Four League Bay, running generally north and south, is a channel approximately 50 to 60 feet wide and four to five feet deep at mean tide. The western bank of the channel is marked by a row of piling. The eastern bank is unmarked and sloped gently from the four or five foot depth of the channel to the two or three foot mean depth of the bay. At the time of the collision there was no appreciable wind or tide and it was broad daylight.

The Dos Nietas and the tugs came in sight of each other at a distance of approximately two miles. At the time, the Dos Nietas was north of the point of collision, proceeding south, and the tugs,

made up in tandem to the barge, were working their engines and swinging from side to side in the channel in an effort to free the barge from the strand. The lead tug was the LaCache, 50' in length, 16' in breadth, and propelled by a 190 HP Diesel engine with a single right-hand turning screw. The Tug Connie C. Cenac was made up astern of LaCache on a short single hawser and the Cenac had the barge astern on a short bridle. The Cenac was 51' in length, 16' in breadth, with two Diesel engines developing a total of 500 HP and 32 screws. The barge itself, 145' in length, 45' in breadth, with a normal draft of 5 to 5½ feet, was aground approximately in the center of the channel.

As the Dos Nietas approached the flotilla, her 18-mile cruising speed was reduced to an idling speed of 5 or 6 miles per hour. When within 200 to 300 yards of the LaCache, Arcement, the operator of the Dos Nietas, realized that the barge was aground and, with the operation of the tugs, was blocking the channel. He began reducing speed to two or three m. p. h. Because of the piling marking the west bank of the channel on his starboard hand, he proceeded to port in an effort to effect a starboard-to-starboard passage with the flotilla. By proceeding at dead slow speed slightly outside the channel to the east until his screws began to dig dirt, Arcement was able to maneuver the Dos Nietas around the LaCache, which, with the Tug Connie C. Cenac, was continuing to weave from side to side in the channel in an effort to free the barge. As the Dos Nietas attempted to pass the Cenac, the tugs were still swinging and had reached, at that moment, very close to the east bank of the channel. As the Dos Nietas came abreast of the Cenac's quarter, suction [1] from one or both tugs swept her laterally to the right into the quick water generated by the propeller action of the tugs and thence head on into the starboard forward corner of the barge. Apparently, in an attempt to regain control of his vessel, Arcement increased speed, but that maneuver only succeeded in bringing the Dos Nietas more forcefully in contact with the barge. No signals of any kind were sounded by any of the vessels concerned with the collision.

The Dos Nietas contends that respondent's flotilla was blocking the channel and that, instead of assisting her to maneuver around the stranded barge, the tugs continued to work their engines feverishly and in close proximity to the Dos Nietas, with the result that the Dos Nietas went out of control and into the barge. Respondent, citing authorities,[2] argues that the Dos Nietas, as a moving vessel in collision with a grounded barge, is presumed to be solely at fault and that she has failed in her attempt to overcome this presumption.

■ Unquestionably, the 45-foot barge grounded in the middle of the less than 60-foot channel was effectively blocking that channel. This is particularly true when the maneuvers of the tugs in their effort to free the barge are considered. Under the circumstances, respondent's flotilla owed a duty to assist other vessels attempting to navigate

1. See Plummer, Ship Handling in Narrow Channels (1945). At Page 11, the author states:

"For example, if the ship is dead in the water and the propeller is motionless, then there is no suction. But if the ship is aground or if for any other reason she can not gather way, there will still be suction if the propeller turns; in fact with the propeller only turning over slowly, there is enough suction to cause its effects to be felt very decidedly when abreast of the quarter and close to it; of course, the faster the propeller turns the stronger is the suction and the farther out it is felt. It might be well to elaborate on this by saying that the wheel water which is plainly visible directly astern of the ship (when the propeller is working ahead), is only vaguely thought and spoken of as suction. It is abreast the quarter, where the water apparently has the least motion and apparently is the least harmful, that, in reality, it is the most powerful and dangerous."

2. The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943; The Virginia Ehrman and the Agnese, 97 U.S. 309, 24 L.Ed. 890.

the channel around the obstruction.[3] Instead of complying with their responsibility in this regard, the tugs increased the hazard by swinging from left to right in the channel, creating suction and quick water. And it was suction and quick water which caused this collision as the Dos Nietas, with very little way on and a consequent reduction in control, sought the east bank of the channel until her propellers were digging up mud in her effort to maneuver past the flotilla.

Unfortunately, the Dos Nietas herself was not free from fault. It was broad daylight. The position and condition of the barge and the tugs were obvious. While the location of the east bank of the channel and the exact depth of water in the vicinity thereof were not as obvious, Arcement, the operator of the Dos Nietas, should have known that, with the draft of his vessel, he would have to stay very near, if not in, the channel. He also should have known that if his vessel, idling in the water, came in contact with the suction or quick water from the tugs, she would go out of control. Knowing this fact, he merely watched the tugs swing from side to side in the channel while he tried to maneuver around them and the barge. He failed to sound the passing signal[4] or the danger signal[5] to let the operators of the tugs know, as they themselves should have known, that their maneuvers constituted a danger to the Dos Nietas. Under the circumstances, both the tugs and the Dos Nietas were at fault and their fault contributed to the collision.

■■■■ Respondent, in an alternative effort to avoid its responsibility for the obvious fault on the part of its tugs, pleads the doctrine of last clear chance. The doctrine of last clear chance has been evolved by law courts in an effort to relieve the rigor of the common law defense of contributory negligence,[6] which defense, of course, is unknown in admiralty.[7] Although the doctrine of last clear chance has been used in admiralty, largely by persons who, being unfamiliar with the subject, would equate the navigation of slow-responding vessels at sea to the operation of quick-responding vehicles on the highway, it has limited application.[8] Certainly it has no application where, as here, the negligent operation of the tugs continued up to the moment of the accident under circumstances where the danger therefrom was evident.

Decree accordingly.

---

3. The Nevada, 106 U.S. 154, 1 S.Ct. 234, 27 L.Ed. 149; The Marine, D.C.E.D. N.Y.1942, 45 F.Supp. 12, 1942 A.M.C. 726; McLain Line, Inc., v. Steamship Carreta, 1944 A.M.C. 523 (S.D.N.Y., 1944); Hedger Transportation Co. v. Tugs Ideal and Evelyn Mathiasen, et al., 1944 A.M.C. 257 (E.D.N.Y., 1944); Goodwin-Gallagher Sand and Gravel Corp. v. Steamtug Seabright, 1933 A.M.C. 164 (S.D.N.Y., 1932); Red Star Towing & Transportation Co. v. Steamtug McGuirl, 1925 A.M.C. 1159 (S.D.N.Y., 1925).

4. 33 U.S.C.A. § 203, Rule I.

5. 33 U.S.C.A. § 203, Rule III.

6. See James, Last Clear Chance: A Transitional Doctrine, 1938, 47 Yale L.J. 709; MacIntyre, The Rationale of Last Clear Chance, 1940, 53 Harv.L.Rev. 1225.

7. The Max Morris, 137 U.S. 1, 11 S.Ct. 29, 34 L.Ed. 586; The Catharine v. Dickinson, 17 How. 170, 58 U.S. 170, 5 L.Ed. 233.

8. The Norman B. Ream, 7 Cir., 252 F. 409, and cases therein cited hold that the doctrine of last clear chance has no application in admiralty. This court has found only three cases which hold otherwise. Crawford v. Indian Towing Company, 5 Cir., 240 F.2d 308; The Sanday, 2 Cir., 122 F.2d 325; The Cornelius Vanderbilt, 2 Cir., 120 F.2d 766. Significantly, Benedict in his monumental six-volume treatise on admiralty does not even mention the subject.