**CENAC TOWING COMPANY, Inc.,**
**Appellant-Appellee,**

v.

**W. A. RICHMOND, Appellee-Appellant,**

**W. A. RICHMOND**

v.

**CENAC TOWING COMPANY, Inc.**

No. 17221.

United States Court of Appeals
Fifth Circuit.

April 1, 1959.

Charles E. Lugenbuhl, New Orleans, La., Lemle & Kelleher, for appellant.

George W. Healey, III, New Orleans, La. (Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., of counsel), for appellee.

Before RIVES, CAMERON and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

On November 22, 1955, in broad daylight, the crewboat, Dos Nietas, collided with a drilling barge in tow of the tugboats Lacache and Connie C. Cenac. At the time of the collision the barge was aground and the tugs were trying to free it from the strand. W. A. Richmond, owner of the Dos Nietas, filed a libel against the two tugs in rem and against the Cenac Towing Company, Inc., owner of the tugs, in personam. The district court held that both the tugs and the Dos Nietas were at fault and divided the damages, allowing libellant to recover in rem one-third of his damages from the tug Lacache and one-third from the tug Connie C. Cenac; two-thirds from the Cenac Towing Company in personam. 157 F.Supp. 400.

On appeal Cenac asserts that the district court improperly applied the law to the facts, and, in particular, misconstrued the decision of this Court on last clear chance in Crawford v. Indian Towing Co., Inc., (The Suwannee—Cherokee) 5 Cir., 1957, 240 F.2d 308. Richmond cross-appealed, asserting that the Dos Nietas was free of any fault contributing to the collision and that the collision resulted solely from the fault of the tugs. We affirm.

## I.

The collision occurred in Four League Bay, a shallow bay in the Louisiana marshes. A channel, fifty to sixty feet wide and four to five feet deep at mean tide, runs north and south through the middle of the bay. The western bank of the channel is marked by a row of piling. The eastern bank is not marked. It slopes gently from the four or five foot depth of the channel to the two or three foot mean depth of the bay.

Respondent makes much of the point that the Dos Nietas is a highly maneuverable, powerful, light craft. The Dos Nietas is a wood hull crewboat, forty-five feet long, with a twelve foot beam, and an unladen draft of three and a half feet. She is powered by two two-hundred horsepower Diesel engines that give her speed in excess of twenty miles per hour. The tugs are each fifty feet long, sixteen feet wide, and draw five and one-half to six feet. The Lacache has a single screw one hundred ninety horsepower Diesel engine. The Cenac is powered by twin Diesels developing about five hundred horsepower. The barge was one hundred forty-five feet long, forty-five feet wide, and has a draft of six feet.

The morning of the collision was clear and calm. The Dos Nietas was proceeding south on her way from Morgan City, Louisiana, to Oyster Bayou Lighthouse in the Gulf of Mexico. Arcement, a certified motorboat operator, was at the helm. The two tugs with the barge in tow were proceeding north into Four League Bay. They were in tandem. The Cenac was made up astern of the Lacache on a short single hawser and the barge was astern of the Cenac on a short bridle. As the flotilla was proceeding in the bay, the barge went hard aground in the channel, her port side approximately fifteen to twenty feet off the west side of the channel. The channel obstruction was apparent.

The Dos Nietas sighted the flotilla at a distance of two miles. The tugs were working feverishly, weaving and swinging from side to side in the channel in an effort to free the barge. As the Dos Nietas came closer she reduced her speed to five or six miles per hour. Then, when the Dos Nietas was about two hundred to three hundred yards from the Lacache, Arcement realized the barge was aground and that the barge and tugs blocked the channel. He reduced his speed to a bare two to three miles per hour. The feverish activity of the tugs continued. Arcement went to port outside of the channel, in the shallow waters of the bay, to effect a starboard-to-starboard passing. He could not proceed to starboard because of the piling marking the western bank of the channel. His screws dug dirt in the shallow water. It was difficult to maneuver. The tugs kept trying to free the barge, still weaving from side to side and running their propellers at full speed apparently without regard for the Dos Nietas. The Dos Nietas managed to pass the Lacache. As it attempted to pass the Cenac, however, the tugs had swung close to the east bank of the channel. When the Dos Nietas came abreast of the Cenac's quarter, suction and quickwater from the tugs' propellers drew the crewboat laterally toward the channel. She rammed into the forward starboard corner of the barge. At the last moment, Arcement tried to avoid being drawn into the barge by increasing his speed. That caused only a more violent collision.

None of the vessels sounded any signals at any time.

## II.

▇ The district court found that the tugs were at fault in running their engines and trying to free the barge while the Dos Nietas was attempting to pass; that the Dos Nietas was at fault in attempting to pass the flotilla without sounding any signals when the danger was plain. As we view the case, we cannot say that the negligence of either vessel was wholly sufficient to account for the collision. The district court properly divided the damages. Mississippi Valley Barge Line Co. v. Esso Shipping Co., 5 Cir., 1957, 240 F.2d 606, 607.

█ The approach and intent of the Dos Nietas was apparent to the tugs' operators for at least twenty minutes before the collision. Since the flotilla was blocking the channel, the tugs owed a responsibility not to hinder or to make hazardous the attempt of a passing vessel to maneuver around the obstruction.[1] See McAllister Lighterage Line v. The Pejepscot, 2 Cir., 1957, 243 F.2d 794. No action was taken to help the Dos Nietas negotiate a safe passage around the obstruction, although it was apparent that she would pass close by. The tugs increased the hazard by swinging from left to right and continuing to operate the propellers at full speed, creating suction and quickwater—when the danger was apparent. As the district court found: "It was suction and quick water which caused this collision as the Dos Nietas, with very little way on and a consequent reduction in control, sought the east bank of the channel until her propellers were digging up mud in her effort to maneuver past the flotilla." [157 F.Supp. 400.]

█ The Dos Nietas was also at fault. Arcement saw the flotilla from two miles out. He watched the tugs swinging and weaving until the moment of the collision. He knew or should have known that the draft of the crewboat would not allow him to go far enough out of the channel to pass the flotilla. He should have known that the Dos Nietas would be so dangerously near the suction and quickwater created by the tugs that the vessel would go out of control. Yet he tried to pass without sounding a passing signal or a danger signal.

█ The libellant says that no signal was necessary.[2] But when, as in this case, safety requires a radical change of navigation, the danger signal should be given if other vessels are near. Merritt, Chapman & Scott Corp. v. Texas Co., 2 Cir., 1938, 98 F.2d 719. In Tank Barge Hygrade v. The Gatco New Jersey, 3 Cir., 1958, 250 F.2d 485, there was a collision between a tanker and a tug in tow. The tug headed straight toward the tanker. The tanker had blown the signal to go to the tug's port. When the captain of the tanker saw the tug bearing down on him, instead of blowing the danger signal the captain blew the signal to go to port again. On appeal, the court held that although the tug was grossly at fault, the failure of the tanker to blow the danger signal was not merely venial or purely technical, and although the fault of the tanker was minor in comparison, the damages were properly divided.

"[T]here is a reasonable probability that if Hayes had blown the danger signal and immediately reversed her engines instead of blowing a second passing signal the captain of the Gatco might have desisted from his intended course and taken action which could have avoided the collision."

It is more difficult in this case than in the case of The Gatco to say whether one party was more negligent than the other. Certainly, if the danger signal, or some signal, had been given, the tugs might have taken action to avoid the collision.

1. The Nevada, 106 U.S. 154, 1 S.Ct. 234, 27 L.Ed. 149; The Marine, D.C.E.D.N.Y. 1942, 45 F.Supp. 12, 1942 A.M.C. 726; McLain Line, Inc. v. Steamship Carreta, D.C.S.D.N.Y.1944, 1944 A.M.C. 523; Hedger Transportation Co. v. Tugs Ideal and Evelyn Mathiasen, D.C.E.D.N.Y. 1944, 1944 A.M.C. 257; Goodwin-Gallagher Sand and Gravel Corp. v. Steamtug Seabright, D.C.S.D.N.Y.1932, 1933 A.M.C. 164; Red Star Towing & Transportation Co. v. Steamtug McGuirl, D.C. S.D.N.Y.1925, 1925 A.M.C. 1159.

2. Griffin summarizes the law on the failure to sound signals where the information to be conveyed by such signals is apparent: "In practical navigation it is, of course, true that, where the mode of passing is obvious, whistle signals are frequently omitted. While the Half-Mile Rule may require such signals, it is believed that the courts would be slow to condemn a vessel merely for failing to announce by whistle an obvious intention, if the real cause of collision were a distinct act of negligent navigation on the part of the other vessel." Griffin on Collision, § 68, p. 201 (1949).

In Crawford v. Indian Towing Company (The Suwannee, The Cherokee), 5 Cir., 1957, 240 F.2d 308, 310, this Court held the Cherokee at fault for failing to turn and take the open water beyond the channel:

"Electing rather than to turn to the north outside of the prolongation of the dredged channel (although perfectly safe to do so), to hold to its own course within the narrow confines of the marked waterway the light tug maintained its collision course in the expectation that the flotilla consisting of a 75-foot tug and a 240-foot loaded barge, would 'fall off' to the south to permit a port to port passage."

Here, the Dos Nietas did just what this Court said the Cherokee should have done. It went outside of the channel, even though it was not safe to do so. On their part, the tugs should not have increased the difficulties of the passage by swinging back and forth and continuing to race their engines.

### III.

Cenac contends that the district court erred in holding that the doctrine of last clear chance has no application in admiralty; that if the doctrine had been applied, the tugs would be exonerated. Cenac relies on Crawford v. Indian Towing Co., Inc. (The Suwannee, The Cherokee), 5 Cir., 1957, 240 F.2d 308.

The district court did not go as far as the respondent claims, but it did hold:

"The doctrine of last clear chance has been evolved by law courts in an effort to relieve the rigor of the common law defense of contributory negligence, which defense, of course, is unknown in admiralty. Although the doctrine of last clear chance has been used in admiralty, largely by persons who, being unfamiliar with the subject, would equate the navigation of slow-responding vessel at sea to the operation of quick-responding vehicles on the highway, it has limited application. Certainly it has no application where, as here, the negligent operation of the tugs continued up to the moment of the accident under circumstances where the danger therefrom was evident."

Admiralty courts are civil law courts. They never experienced the agonies common law courts went through in developing a socially acceptable escape (the last clear chance doctrine) from the harsh rule that the defense of contributory negligence, however slight, bars recovery. The escape was managed by an appeal to rationality: the effect of contributory negligence on the principle of causation. A negligent plaintiff may not recover, because he caused his own injury. His negligence was *the* proximate cause; unquestionably, if the plaintiff's fault were later in time than the defendant's fault. We have come a long way, however, from Davies v. Mann, 10 M. & W. 546 (Ex.1842). The shift in thinking, reflected in comparative negligence statutes, toward evaluating the conduct of the parties and weighing their proportionate share in the accident (which the layman does without straining his ratiocinative processes) is now leaving little elbow room for the last clear chance doctrine.

On the other hand, from ancient times rusticum judicium in admiralty has made it unnecessary for courts to strain in order to do justice in a collision case where there is some blame on both sides. In admiralty contributory negligence does not necessarily defeat recovery. It results only in a division of damages. If there is no last clear chance rule in collision cases, it is not because vessels are more slow-responding than animals and automobiles; it is because courts which do not have to agonize over contributory negligence have no need for the last clear chance rule.[3]

---

3. See James, Last Clear Chance: A Transitional Doctrine, 47 Yale L.J. 709 (1947); MacIntyre, The Rationale of Last Clear Chance, 53 Harv.L.Rev. 1225 (1940); Staring, Contribution and Division of Damages in Admiralty and Mari-

■ This does not mean that a somewhat blameworthy respondent must always be liable for his part of divided damages. Each case stands on its own. Call it anything: a condition, a remote cause, a non-contributing fault, the last clear chance; if, in the circumstances of the particular case, the respondent's fault is slight in comparison with the libellant's or if there was a clear cleavage between respondent's fault and the collision, an admiralty court will evaluate the respective degrees of fault and exonerate the respondent.[4] That is just about what we said in The Suwanee, The Cherokee. We reiterate it, here:

"Whether this be called an application of the doctrine of last clear chance or the rule of causation, makes little difference. Where, as here, an act is negligent, but is not the proximate cause of the injury, it is merely a condition. As such it is not a basis of liability. P. Dougherty Co. v. United States, 3 Cir., 207 F.2d 626. * * * The damage to the Cherokee is attributable entirely to this gross fault on the part of her navigator."

In very few opinions does an admiralty court exonerate a respondent in terms of last clear chance. This Court did in The Suwanee, The Cherokee, holding that "the Cherokee clearly had the last clear chance to avoid the collision", but explaining, as quoted above, our understanding of last clear chance. In that case the tug Suwanee with a tow was at fault in blocking a marked waterway. By the time the Suwanee met the Cherokee the tow had passed out of the dredged part of the waterway and was in open water. The Cherokee could have passed safely on the outside of the dredged channel. Instead, without reducing speed it ran down the Suwanee in an end-on collision through its "blind insistence on a right of way". "I ain't got no habit of running from people in the channel", was the way the Cherokee's navigator put it. It is not surprising that this Court put all of the blame on the Cherokee.

In The Watuppa (The Cornelius Vanderbilt), 2 Cir., 1941, 120 F.2d 766, 768, the Watuppa and her barge were on the wrong side of the East River Channel. She had a tow on a long hawser, difficult to manage in dangerous waters. The Hempstead with barges in tow saw the Watuppa but pulled out anyway, intending to cross the stern of that vessel. Ordinary care on the part of the Hempstead would have avoided a collision. Instead, the Hempstead came across too soon and swung into the Watuppa. The Watuppa was not in a position to swing her tow away from the Hempstead's barges in time to avoid a collision. Each vessel neglected to blow passing signals. The Court held that "the outstanding fact is that the Hempstead had the last clear chance to prevent a collision."

In The Sanday, 2 Cir., 1941, 122 F.2d 325, the Michigan, a southbound motor vessel, saw, when eighteen hundred feet away, a northbound tug with her tow tailed over onto the wrong side of a narrow channel. The tug failed to sound a bend signal. The Court, citing The

time Cases, 45 Cal.L.Rev. 304 (1957); Griffin, The American Law of Collision (1949), Chapter XVII.

4. "It is clear from these statements that no definite, objective rule can be formulated which will determine when a prior fault is contributory, further than to say that, if the prior fault of one vessel directly tended to cause the collision, it is regarded as contributory, unless the later fault of the other vessel (1) was the immediate and predominating cause; (2) was more than error of judgment; and (3) was not in extremis. Sec. 215.

'Last Clear Chance.' From what has already been said, it follows that the so-called 'last clear chance' rule is not to be applied in collision cases, unless with very strong emphasis on the word 'clear', and unless there is a definite line of cleavage between the final fault and all that has gone before (The Silvia [D.C.] 2 F.2d 105, 1924 A.M.C. 1222; see Sec. 217, infra). In such cases as have used the phrase and have exonerated the earlier wrongdoer, the courts have found such a cleavage (e. g. [The], El Monte, C.C.A. 5, 252 F. 59 [1918]; The Perseverance, C.C.A. 2, 63 F.2d 788, 1933 A.M.C. 508;

Watuppa and the last clear chance rule, held that the Michigan was solely responsible because she had ample opportunity to avoid the collision. In The Sakito Maru, D.C.Cal.1941, 41 F.Supp. 769, 779, the Court pointed out that while the rule "is not generally considered applicable in this country in admiralty", citing The Norman B. Ream, 7'Cir., 1918, 252 F. 409, our courts "have not been backward in applying the rule under whatever name it may be labeled". See also The Yucatan, 9 Cir., 1915, 226 F. 437; The Silvia, D.C.E.D.N.Y.1924, 2 F.2d 105, and, Manhattan Lighterage Corp. v. United States, D.C.S.D.N.Y.1951, 103 F.Supp. 274. In dozens, perhaps hundreds, of other decisions, too numerous to mention, courts have reached the same result on analogous facts without benefit of "last clear chance".[5]

The unarticulated rationale, as we see it, is a judicial weighing of the degrees of fault of the parties: comparative negligence without apportionment of damages.

In this case the Dos Nietas was at fault. But the negligent operation of the Cenac tugs continued up to the moment of the accident. The persistence of the tugs in continuing to weave and swing back and forth and to race their propellers in stubborn disregard of the attempt of the Dos Nietas to effect a passage by going outside of the channel is on par with the negligence of the Cherokee's navigator.

In this case thanks to their being *two* tugs, the rule of divided damages achieves about the same result that the rule of apportionment of negligence would achieve. It seems a fair assessment of the fault.

The decree is

Affirmed.

---

The Sanday, C.C.A. 2, 122 F.2d 325, 1941 A.M.C. 1249; and see the Nereus [D.C.], 23 F. 448, at [page] 457 [1885]. In other cases it is denied that the 'last clear chance' rule is applicable in admiralty (The Norman B. Ream, C.C.A. 7, 252 F. 409 [1918]." Griffin on Collision, p. 490.

5. See cases collected by Griffin under the headings: Successive Faults—When Earlier Fault Contributory—Remoteness; Successive Faults—First Fault not Contributing—Condition, not Cause; Contemporaneous Faults—Both Contributing; Other cases of Non-Contributing Fault; Major and Minor Faults. Griffin on Collision, Chapters XVII and XVIII.