**TIGER SHIPPING COMPANY, S.A.,**
**Plaintiff,**

v.

**The TUG CARVILLE, in rem, and Allied Towing Corporation, in personam, Defendants.**

**Civ. A. No. 240–73–N.**

United States District Court,
E. D. Virginia,
Norfolk Division.

July 17, 1974.

As Amended Nov. 11, 1974.

Robert M. Hughes, III, of Seawell, McCoy, Winston & Dalton, Norfolk, Va., for plaintiff.

Morton H. Clark of Vandeventer, Black, Meredith & Martin, Norfolk, Va., for defendants.

## MEMORANDUM OPINION

WALTER E. HOFFMAN, District Judge.

The S. S. SONIC is a large collier, 748 feet in length and 109 feet in beam. On the night in question she left her coaling pier at Lambert's Point in Norfolk near midnight, partially laden with coal, to anchor in Anchorage "B" (see appended chart). The weather was bad; a strong westerly wind of 30–35 knots tended to blow her out of the channel, despite her draft of 35 feet aft and 26 feet forward, unless she maintained adequate steerageway. Her pilot, Wallace Harwood, an experienced, licensed Hampton Roads pilot, intended to proceed down the Harbor Reach Channel to its junction with the Entrance Reach Channel, and from that junction directly to Anchorage "B".

The tug CARVILLE is an 81 foot diesel tug. On the night in question she was towing an empty chemical barge, AC#3, on a 1200 foot hawser along the coast from New York to Morehead City, North Carolina. Adverse weather and heavy seas forced the tug to seek shelter in Hampton Roads. Despite an Inland Pilot Rule [1] requiring the shortening of towing hawsers to 450 feet before entering Hampton Roads, the CARVILLE was unable to shorten her hawser in Chesapeake Bay because of heavy seas breaking over the after decks and towing gear. After entering the shelter of Hampton Roads and gaining sufficient room to leeward by heading up to Nun Buoy #16 (see appended chart), she commenced to shorten hawser, drifting to the southeast under the combined effects of wind and an incoming tide; the barge gradually shifting from a northeast to southeast bearing from the tug due to its more rapid drift.

After shortening the hawser only 150–200 feet, the hawser fouled and had to be cleared by hand, necessitating the introduction of slack into the hawser. This slack threatened to foul the propeller of the CARVILLE and made the tug and its tow unmaneuverable until the crew would be able to clear the foul. At least five members of the seven man crew were engaged in attempting to clear the foul. No one was assigned the job of lookout, and no one was in the wheelhouse though there was a man at a rudimentary after control station which had engine and rudder controls, but no whistle and no radio.

The SONIC, proceeding down the Harbor Reach Channel at six to eight knots, sighted the tug visually and the

---

1. 84.10 Hawser lengths for all tows on inland waters.

(a) The length of hawsers, between vessels, shall be limited to no more than 450 feet (75 fathoms). This length shall be the distance measured from the stern of one vessel to the bow of the following vessel. The distance between two vessels should in all cases be as much shorter as the weather or sea will permit:

*Provided,* That where, in the opinion of the master of the towing vessel, it is dangerous or inadvisable, whether on account of the state of weather or sea or otherwise, to shorten the distance between vessels, the hawsers need not be shortened to the prescribed length when entering from sea.

(b) In any event the hawsers between vessels must be shortened to the prescribed length of not more than 450 feet (75 fathoms) when the tows with inland or seagoing barges are operating in the following named localities:

(1) The James River and Hampton Roads westward of Thimble Shoal Light . . . .

tug and tow on radar at a distance of about three miles from its position abreast the grain elevator (marked "2" on the appended chart). Pilot Harwood surmised quite correctly that the tug was shortening hawser and having a difficult time of it. To allow the tug and tow time to clear the area he reduced the speed of the SONIC to the minimum practicable that would permit her to remain in the channel, two to three knots.

Upon the SONIC's reaching the junction of the Harbor and Entrance Reach Channels, the tug and tow had still not cleared the area. Pilot Harwood, abandoning his original intention of proceeding directly to the anchorage, elected to make a turn to starboard and proceed down the Entrance Reach Channel, passing astern of the tug and tow, before swinging up to his anchorage. His decision was based on two conjectures, that the tug and tow would get underway and clear the area, fouling the SONIC if she elected to pass ahead of the tug by turning to port, or that possibly the barge was adrift from the tug in which case it would blow clear of the channel. He made no signal of his intentions to the tug.

On board the CARVILLE the SONIC was sighted while still in the Harbor Reach Channel, prior to its starboard turn. The SONIC's red and green side running lights were not observed, but its white range lights were observed, open to the right, indicating that the SONIC would pass ahead of the CARVILLE.[2] Through inattention and the screening of the SONIC from the view of the tug's crew by the tug's superstructure, the SONIC's turn to starboard was not observed, and the SONIC was not again observed until moments before the collision. No signals were made by the CARVILLE at any time, and no radio communication was attempted, though had it been, it would have been unlikely of success since the CARVILLE did not know what frequency the SONIC would be able to receive.

The SONIC sighted the barge visually moments before colliding with it. The final maneuvers of the SONIC were hampered by the close proximity of the starboard bank of the channel and Buoy #3 and were unavailing. The barge struck on the port bow of the SONIC while the SONIC was still making forward way through the water. The SONIC did not signal its last minute maneuvers. The tug itself was not involved in the collision.

The tug CARVILLE is alleged to have been at fault for her failure to shorten hawser, her failure to sound the danger signal, and her failure to maintain a proper lookout.

The SONIC is alleged to have been at fault for her failure to make proper use of her radar, failure to maintain a proper lookout, failure to stop or proceed with caution when the danger of collision became apparent, failure to sound a passing signal, failure to sound a backing signal when her engines were reversed *in extremis,* and failure to navigate in accordance with the General Prudential Rule.

The rule of The Pennsylvania, 86 U.S. 125, 22 L.Ed. 148 (1874), makes a statutory fault a presumption of liability unless it can be shown that the fault could not have contributed to causing the collision. Applying this strict rule, certain of the faults alleged do not import liability because they were not and could not have been contributing causes of the collision. The failure of the SONIC to signal her backing of her screw and maneuvering *in extremis* is one such fault, since any warning such as a signal given to the unmaneuverable CARVILLE and unmanned barge AC#3 would have been unavailing. The fail-

---

2. It is difficult to reconstruct how the CARVILLE could have observed the SONIC's range lights open to the right, unless the SONIC had swung wide in anticipation of its starboard turn, or was proceeding crabwise up the channel because of the effects of wind and tide.

ure of the CARVILLE to sound the danger signal *immediately prior* to the collision when the SONIC was sighted almost on the barge is another such fault since the SONIC was, once in the Entrance Reach, unable to maneuver in any other fashion than she did.

■ The failure of the SONIC to make proper use of her radar or to keep a proper lookout,[3] if there were any such failure, is also not a contributing cause of the collision. The lookout that the SONIC kept and the radar information available made the pilot as well informed as was possible. No lookout and no radar set could have told him at a distance of a mile at night that the hawser of the CARVILLE was under her counter and close to her propeller, and this was the only significant datum that the pilot lacked.

■ The failure of the CARVILLE to shorten hawser before entering Hampton Roads, though a proximate cause of the collision, is an excusable fault. Article 27 of the Inland Rule provides:

GENERAL PRUDENTIAL RULE

In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger.

The weather, which made the shortening of the hawser before entering Hampton Roads impossible, may properly be construed as such a special circumstance permitting noncompliance with the rule providing for the shortening of hawsers, particularly since the CARVILLE attempted to comply as soon as the situation made it possible.

The remaining faults—the failure of the SONIC to sound a passing signal, to sound the danger signal well in advance of the collision, and to stop when sufficient room was available to heave to or anchor, and the failures of the CARVILLE to sound the danger signal well in advance of the collision and to keep a proper lookout—were all proximate and contributing causes of the collision. The general rule in admiralty, of course, is that mutual fault means mutual liability with each ship liable for one-half of the total damages.

The CARVILLE argues, with what grace it can, that the failure of the SONIC to stop was the crucial fault and that the "last clear chance" doctrine should apply to excuse the CARVILLE from liability.

■ The last clear chance doctrine is little more than a restatement, perhaps inappropriately, of the major-minor fault rule. Cenac Towing Co. v. Richmond, 265 F.2d 466 (5 Cir. 1959). An examination of the cases cited by the CARVILLE [4] shows that in each case

---

3. Failure to keep a proper lookout is not a direct statutory fault, save as embraced in the Rule of Good Seamanship, Art. 29 of the Inland Rules. Though it is not necessary to show that failure to keep a proper lookout *could not* contribute to the collision, the proper party must meet the burden of showing that it *did not* contribute. Anthony v. Int. Paper Co., 289 F.2d 574 (4 Cir. 1961); Esso Standard Oil Co. v. Oil Screw Maluco I, 332 F.2d 211 (4 Cir. 1964).

4. The Sanday, 32 F.Supp. 455 (E.D.N.Y. 1940), aff'd. 122 F.2d 325 (2 Cir. 1941), (tug with tow "bellying out" as a result of following winding channel; other vessel failed to promptly reduce speed); The Watuppa, 120 F.2d 766 (2 Cir. 1941), (tug and tow on wrong side of channel; other tug and tow failed to slow and navigate with caution); Crawford v. Indian Towing Co., Inc., 240 F.2d 308 (5 Cir. 1957), (tug and tow "flanking" down channel; other vessel failed to avoid). Cernac v. Richmond, *supra*, has a lengthy discussion of the doctrine of "last clear chance" as applied in admiralty.

where the doctrine has been applied the following situation has been present:

1. One vessel has created a dangerous situation or condition which it can no longer easily correct.

2. The second vessel has knowledge of the dangerous situation or condition.

3. The second vessel fails to avoid the dangerous condition or situation when it may easily do so.

On the face of it this case might appear to fit within the definition. Certainly the CARVILLE had created a dangerous condition of tug and tow drifting across the anchorage and channel, and had effectively lost control of the situation when she no longer could maneuver. Certainly, the SONIC could have avoided the dangerous situation by using the deep water naval maneuvering area at the end of the Harbor Reach Channel to heave to by heading the SONIC into the wind or by anchoring until the tug and tow were clear.

The difficulty is with the knowledge that the SONIC had of the dangerous condition. As is often the case with ship navigation, crucial decisions must be made well in advance of the time when their importance is obvious. In this case, the only deep water area available to Pilot Harwood to heave to or anchor in was the carrier turn around and junction area at the end of the Harbor Reach Channel.[5] Once past the carrier turn around and the junction, the wind and draft of the SONIC and the blocking line of the tug and tow committed him to proceeding down the channel at no less than two to three knots and passing by the stern of the tow with no room for effective maneuvering. Thus it is his knowledge as of the moment when the SONIC was abreast of the carrier turn around and the channel junction perhaps one-half mile distant of the point of collision that is important.

In his deposition Pilot Harwood very forthrightly stated his initial supposition on sighting the CARVILLE that she was a tug shortening her hawser and his later supposition that she was having difficulty in so doing. But coupled with these suppositions were the further suppositions that the CARVILLE would momentarily maneuver to tow the barge clear or that the barge was adrift from the tug and would rapidly clear the channel. The crucial datum, that the CARVILLE was unmaneuverable and that tug and tow would necessarily continue to slowly drift across the channel, was never available to him.

■ Pilot Harwood is to be commended for the correctness of the initial suppositions that he did make; that he did not make the further supposition that tug and tow were unmaneuverable and would remain so is not error on his part. His error was in proceeding into a situation that he could not adequately identify without conforming to Articles 27 and 29 of the Rules by stopping until the situation was clear. This error was compounded by his failure to signal. Unsure of the situation, he failed to sound the inland signal designated for precisely that situation—the danger signal of Article 18, Rule III. Having decided to pass astern of the tug and tow, he failed to make that decision clear to the other vessel by sounding the appropriate passing signal. Either signal would have attracted the attention of

5. On the appended chart the carrier turn around area is identified as "Naval Maneuvering Area." In actuality more deep water was available; later charts show the area in the fork between the Entrance and Harbor Reach Channels had been dredged to a depth of 45 feet, but the dredged area had not been surveyed and this information was not shown on the most recent chart prior to the collision. The appended chart has been amended to reflect the situation as it was shown on the then current charts.

the tug and given her a chance to make her own situation clear to the SONIC by continuous sounding of the danger signal.

■ The failure to give these signals was both a statutory fault and a failure of good seamanship. It is a fault unexcused within the *Pennsylvania* rule, for the sounding of the danger signal or crossing or overtaking signal very probably would have caused the CARVILLE to observe the SONIC and her starboard turn, realize the collision potential, and sound the danger signal herself in an attempt to communicate to the SONIC the tug and tow's predicament.

■ The crucial failure of the CARVILLE was this failure to attempt to communicate her predicament to the SONIC. From the time the SONIC, or any other vessel, was first sighted the tug should have continually blown the danger signal for she was manifestly a source of danger to any vessel in her vicinity unaware of her difficulties.

■ A vessel completely disabled is clearly unable to comply with ordinary meeting and passing rules. She is, however, under a corresponding obligation to apprise other vessels that may approach her of her plight. Should she break down outside inland waters her condition should be advertised by the use of the required two black balls or shapes in daytime, and two red lights at night, and the whistle signals of one prolonged and two short blasts when under way in fog. Should the breakdown occur under the exclusive jurisdiction of Inland and Pilot Rules, where none of these signals is authorized, then the vessel's helplessness should be made known to an approaching vessel by a timely use of the Inland danger signal. R. F. Farwell, Rules of the Nautical Road (3rd Ed.), p. 330.

■ Though it has been held that where the Inland Rules provide no signal, the exercise of good seamanship may require a vessel operating under the Inland Rules to use a signal authorized by International Rules, United States v. Woodbury, 175 F.2d 854 (1 Cir. 1949), the International Signal for a vessel not under command is reserved by the Inland Rules for hydrographic and other special vessels, and its use thus possibly confusing and forbidden. The Socony No. 115, 58 F.2d 392 (S.D. N.Y.1932), aff'd. 63 F.2d 226 (2 Cir. 1933).

In The Socony No. 115, *supra*, a situation quite similar to the present one was presented, with the exception that the disabled vessel there was sounding the danger signal, which was either not heard or misunderstood by the vessel under command.

It is perhaps comforting that in both of these collisions, separated by forty years, there was no loss of life, but it is equally disquieting to infer that loss of life is necessary in order for this obvious deficiency of a lack of a "not under command" signal in the Inland Rules to be corrected. In no small part the true cause of this collision was neither the fault of the SONIC nor the CARVILLE, but the fault of those charged with the duty of drafting and revising the Inland Rules.

Nonetheless, we hold both vessels mutually liable for their respective failures to navigate according to the Inland Rules and good seamanship, for had they followed the Rules faithfully and exercised good seamanship, this collision would not have occurred.

Counsel for both sides are to be commended for their clear and timesaving presentation of this matter to the court.

Counsel for Tiger Shipping Company, S.A. shall prepare a judgment order in accordance with this opinion.

① Carville commences shortening hawser.

② Sonic first sights Carville.

③ Carville first sights Sonic.

④ Collision between Sonic and Barge AC #3.